John **MARSHALL** and Charles Del Monico, Appellants,

v.

**UNITED STATES** of America, Appellee.

No. 19383.

United States Court of Appeals Ninth Circuit.

Jan. 27, 1966.

Rehearing Denied March 10, 1966.

William B. Beirne, A. L. Wirin, Fred Okrand, Los Angeles, Cal., for appellant John Marshall.

Harold J. Ackerman, Drake & Ackerman, Los Angeles, Cal., Raymond W. Bergan, Williams, Wadden & Stein, Washington, D. C., for appellant Charles Del Monico.

Manuel L. Real, U. S. Atty., John K. Van de Kamp, Asst. U. S. Atty., Chief, Crim. Div., J. Brin Schulman, Asst. U. S. Atty., Asst. Chief, Crim. Div., Burt S. Pines, Asst. U. S. Atty., Los Angeles, Cal., for appellee.

Before BARNES, HAMLEY and JERTBERG, Circuit Judges.

BARNES, Circuit Judge:

Three of four alleged conspirators were indicted by a grand jury in Count I of a three count indictment, alleging a conspiracy to travel in interstate com- merce with intent to aid racketeering enterprises (18 U.S.C. § 1952).

The three indicted were John Marshall (also known as Marshall Caifano), Charles Del Monico (also known as Charles Tourine, Jr.) and Allen Smiley (also known as Aaron Smehoff). The fourth unindicted coconspirator was Nicholas Dandolas (also known as Nick the Greek).

The "racketeering enterprises" were alleged to have been: to travel in inter- state commerce with intent to (a) (1) distribute the proceeds of unlawful ac- tivity, namely: extortion; (2) commit a crime of violence to further unlawful ac- tivity, namely: extortion and (3) pro- mote, manage, establish, carry on and facilitate the promotion, management, es- tablishment and carrying on of unlawful activity, namely: extortion; and to thereafter perform and attempt to per- form acts specified in (1), (2) and (3) above, in violation of Title 18, United States Code, Section 1952.

The objects of said conspiracy were al- leged to have been accomplished by the conspirators and the unindicted cocon- spirators traveling in interstate com- merce to locate, and in violation of Neva- da and California law to extort, money from one Ray Ryan. There then follow- ed in Count I a recital of some fifteen al- leged overt acts.

In Count II the two appellants were charged with traveling from Las Vegas, Nevada, to Palm Springs, California, on April 26, 1963, for the purpose of com- mitting the crime of extortion. (18 U.S. C. § 1952.) Allen Smiley was named as an aider and abettor (18 U.S.C. § 2). The trial judge granted an acquittal on this count as to all defendants. As to Smiley, the motion was granted before the case went to the jury; as to appel- lants, after their conviction by the jury.

In Count III, the three defendants were charged with traveling from Palm Springs, California, to Las Vegas, Neva- da, on May 1, 1963, for the purpose of committing the crime of extortion. Smiley was granted an acquittal before the case went to the jury—the motion of

the other defendants for acquittal was denied both after the evidence was in and after the guilty verdict.

Marshall was sentenced to five years, consecutively, on both Counts I and III, Del Monico to five years concurrently on each of Counts I and III.

Appellant Marshall urges error on eleven grounds; appellant Del Monico on six —but Del Monico also urges error as to him on all grounds raised by appellant Marshall, and not specifically raised by Del Monico. We consider each in turn.

## I—The Statute

Section 1952 of Title 18, United States Code, reads in material part as follows: " * * *

(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—

(1) distribute the proceeds of any unlawful activity; or

(2) commit any crime of violence to further any unlawful activity; or

(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,

and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

(b) As used in this section 'unlawful activity' means (1) any business enterprise involving gambling, liquor on which the Federal excise tax has not been paid, narcotics, or prostitution offenses in violation of the laws of the State in which they are committed or of the United States, or (2) extortion or bribery in violation of the laws of the State in which committed or of the United States. * * *."

Section 1952(a) (1), though charged in Count I, has no bearing on this case:

there were no proceeds of unlawful activity to "distribute." Appellants were charged in both substantive Count III and conspiracy Count I with interstate travel or interstate use of a facility with the intent to perform the acts prohibited by both subsections (2) and (3) of § 1952(a), and thereafter performing such acts, or attempting to perform them.

The acts prohibited by the statute were the commission of any crime of violence with the intent to further any "unlawful activity"; or to promote or facilitate any "unlawful activity."

"Unlawful activity," as used in § 1952 (a) (1), (2) and (3) is defined in § 1952 (b) (insofar as herein material) as:

"(2) extortion * * * in violation of the laws of the State in which committed or of the United States."

■ It is obvious that the phrase "business enterprise," used in subsection (1) of § 1952(b), is not used in § 1952(b) (2). We conclude, therefore, "business enterprise" applies only to the offenses listed in subdivision (1)—namely: gambling, liquor, narcotics and prostitution offenses, and not to the extortion mentioned in subdivision (2).

■ This seems to be the plain meaning of the language used in the statute, and thus needs no legislative history to interpret it. But additionally, a fair reading of the legislative history indicates that its proponents believed the main target (but not the sole target) of the legislation, was interstate travel to promote gambling. (Hearings of Subcommittee No. 5 of Comm. on the Judiciary, H.R., 87th Cong., 1st Sess. on H.R. 468; and Hearings Comm. on the Judiciary, U.S. Senate, 87th Cong., 1st Sess. on S.Bill 1653. See also letter from Attorney General Kennedy, S.Rep.No. 644, 87th Cong., 1st Sess., p. 3 (1961) [U.S. Code Congressional and Administrative News, p. 2664].) Lesser targets were the "businesses" of traffic in liquor, narcotics and prostitution. Subdivision (2) of the § 1952(b) had a more specific target (even though perhaps a less im-

portant target): extortion, as defined by state laws. It was a single act of extortion (not necessarily a continued course of extortion) which had been accomplished or facilitated by interstate travel that the second subsection of § 1952(b) sought to prevent and punish.

United States v. Teemer, 214 F.Supp. 952, 958 (N.D.W.Va.1963) is the only case cited by appellant Marshall in support of his position that a single act of extortion is not prohibited—there must be a continuous course of business. The language quoted in appellants' brief is accurate, though not complete. But that case concerns itself only with § 1952(b) (1). On page 954, where Judge Paul quotes the "pertinent part" of section 1952 (see n. 1 of that opinion), only subdivision (1) of (b) of § 1952 is quoted—subdivision (2) is omitted as not pertinent. The language quoted is thus applicable only to the § 1952(b) (1) crime therein charged, which is not the crime here charged.

We hold § 1952(b) (2) does apply to the facts charged herein—travel with intent to carry on or facilitate an unlawful activity—to-wit: a single act of extortion.

## II—*Failure to dismiss the indictment*

█ Appellants claim their right to due process was denied, in that the statute is vague, and they were not given notice of the crime charged. They relied particularly on Russell v. United States, 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962), and cases there discussed, as well as Van Liew v. United States, 321 F.2d 664 (5th Cir. 1963).

We ruled on this in Turf Center, Inc. v. United States, 325 F.2d 793 (9th Cir. 1963).

As United States v. Teemer, supra, points out (214 F.Supp. pp. 956–957), Russell v. United States, supra, is a case where appellants were charged with failing to answer questions put to them by a congressional committee. The statute requires such a question must be one "pertinent to the question under inquiry." The indictment stated only that the ques-

tion asked and unanswered was "pertinent to the question under inquiry," and did not state what the "question under inquiry" was. The Supreme Court held the indictments were bad for lack of particularity. The government itself, in Russell v. United States, supra, was not consistent in stating what the question under congressional inquiry was. Thus, the Supreme Court felt it was impossible to ascertain if the question at which the witness balked was within or without the scope of congressional inquiry. We agree. But as we said in Turf Center, Inc., supra, in holding the same statute met the constitutional requirements: "Russell v. United States * * * represents an exception to the rule and is not in point here." Idem. p. 796. Here appellants were accused of interstate travel to facilitate the location of Ray Ryan and the extortion of money from him. Further, here, as in United States v. Teemer, supra, there was more than a "barebones" indictment in statutory language. There were, for example, ten specific acts charged in Count II and six specific acts charged in Count III, and fifteen overt acts allegedly committed by appellants charged in Count I. As this court said in Turf Center, Inc. v. United States, supra, the statute (§ 1952) embodied all the elements of the offense. Cf. Robison v. United States, 329 F.2d 156 (9th Cir.), cert. den. 379 U.S. 859, 85 S.Ct. 115, 13 L.Ed.2d 61 (1964); Rood v. United States, 340 F.2d 506 (8th Cir. 1965); United States v. Spada, 331 F.2d 995 (2d Cir. 1964); Worthy v. United States, 328 F.2d 386 (5th Cir. 1964); Bass v. United States, 324 F.2d 168 (8th Cir. 1963); United States v. Borgese, 235 F.Supp. 286 (S.D.N.Y.1964); United States v. Barrow, 212 F.Supp. 837 (E.D. Pa.1962); United States v. Smith, 209 F.Supp. 907 (E.D.Ill.1962).

The statute refers to the crime of extortion, "as defined by the laws of the state in which committed," or of the United States. Count I charged the extortion was illegal under the laws of Nevada and California. Count III, applying to acts in Nevada alone, would necessarily require a violation of the

**1004**

Nevada statutes (Title 16, Nevada Revised Statutes, § 205.315 [1] or 205.325 [2]).

■ Appellants next urge that § 1952 is in excess of the power granted Congress under Art. I, Sec. 8, the Commerce Clause. Appellants rely on Linder v. United States, 268 U.S. 5, 45 S.Ct. 446, 69 L.Ed. 819 (1925), holding Congress could not, under the guise of taxation, control the practice of medicine under the state law. But the practice of medicine is not illegal. Could not Congress pass a law to prevent interstate travel for the purpose and with the intent to practice medicine illegally—such as unlawful abortions? We think so. And see: United States v. Zizzo, 338 F.2d 577 (7th Cir. 1964); United States v. Borgese, 235 F.Supp. 286 (S.D.N.Y.1964); United States v. Ryan, 213 F.Supp. 763 (D. Colo.1963); United States v. Barrow, 212 F.Supp. 837 (E.D.Pa.1962); United States v. Smith, 209 F.Supp. 907 (E.D. Ill.1962). Nor do we believe that § 1952 constitutes an attempt to enforce state criminal laws, and therefore is violative of the Tenth Amendment: "It is no objection to the assertion of the power to regulate interstate commerce that its exercise is attended by the same incidents which attend the exercise of the police power of the states." United States v. Darby, 312 U.S. 100, 114, 61 S.Ct. 451, 457, 85 L.Ed. 609, 132 A.L.R. 1430 (1941), overruling Hammer v. Dagenhart, 247 U.S. 251, 38 S.Ct. 629, 62 L.Ed. 1101 (1918). See also discussion in Hoke v. United States, 227 U.S. 308, 321, 33 S.Ct. 281, 57 L.Ed. 523 (1913).

**III**

We next consider the position urged by appellants that the jury was permitted to consider overt acts alleged to have been in furtherance of the conspiracy which took place prior to the conspiracy. This because Count II (travel between Nevada and California with intent, etc.) was dismissed "because there is no evidence upon which that count can be sustained." The overt acts in the conspiracy count were alleged to have begun on April 16, 1963, and continued to May 2, 1963 (C.T. 3-4), but the conspiracy was alleged to have taken place between April 1, 1963 and May 2, 1963.

Because substantive Count II was dismissed, appellants urge that any conspiracy to travel from California to Nevada (substantive Count III) must have been entered into, at the earliest, "sometime after defendants left Ray Ryan at the Palm Springs Airport 6:30 to 7:30 P.M. on the evening of April 30, 1963." Overt acts 8, 10 and 15, referring to acts of coconspirator Smiley, were withdrawn from the jury's consideration but appellants object that overt acts 1 to 7, inclusive, referring to acts of codefendants Marshall and Del Monico were not withdrawn, and all were acts occurring prior to Ryan's departure from the Palm Springs Airport on April 30, 1963.

There is no question that the overt acts charged must effect the object to the conspiracy, and until the conspiracy comes into existence, no act occurring prior thereto can effect it.

■ We cannot agree that because the court determined the evidence was insufficient to support a conviction of the substantive offense charged in Count II, that all evidence indicating a conspiracy to violate § 1952, charged in Count I, commencing April 1, 1963, up to 6:30

1. Section 205.315 reads, in pertinent part: "If any person, either verbally or by any written or printed communication, shall maliciously threaten any injury to the person or property of another, with intent thereby to extort money, or any pecuniary advantage whatever, or to compel the person so threatened to do any act against his will, he shall be punished * * *."

2. Section 205.325 reads, in pertinent part: "Every person who, under circumstances not amounting to robbery, shall extort or gain any money, property or advantage, * * * or any property, by means of force or any threat, either:
* * * * *
2. To do injury to any person or to any property; * * *
* * * * *
shall be guilty of extortion and shall be punished * * *."

P.M. of April 30, 1963, must be stricken and removed from the jury's consideration.

We cannot agree primarily because we cannot accept appellants' thesis that the conspiracy charged in Count I, and alleged to have been effected in part by overt acts 1 to 7 between April 16, 1963 and 6:30 P.M. on April 30, 1963, could *only* have been entered into *after* 6:30 P.M. on April 30, 1963. Such a conclusion does not, of necessity, follow.

Three different crimes were charged in the original indictment: I, the conspiracy count; II, the substantive count relating to the travel from Las Vegas to Palm Springs; and III, the substantive count relating to the travel from Palm Springs to Las Vegas.

It has repeatedly been held that a conspiracy to commit a crime is a different offense from the crime that is the object of the conspiracy. United States v. Rabinowich, 238 U.S. 78, 85–86, 35 S.Ct. 682, 59 L.Ed. 1211 (1915).

If both substantive counts had been dismissed, could appellants urge that the conspiracy count should have been dismissed because no overt acts remained? We think not. Braverman v. United States, 317 U.S. 49, 54, 63 S.Ct. 99, 87 L.Ed. 23 (1942); Goldman v. United States, 245 U.S. 474, 477, 38 S.Ct. 166, 62 L.Ed. 410 (1918); United States v. Magliano, 336 F.2d 817, 822 (4th Cir. 1964); Carter v. United States, 333 F.2d 354, 356–357 (10th Cir. 1964); United States v. Manton, 107 F.2d 834, 838 (2d Cir. 1938), cert. den. 309 U.S. 664, 60 S.Ct. 590, 84 L.Ed. 1012 (1940).

We need not recite the evidence (as was done in appellee's brief) to establish there existed substantial evidence from which the jury could infer [3] that the conspiracy began prior to the April 15th, 1963, meeting between Del Monico and Marshall at Las Vegas, Nevada, just prior to their auto trip to Palm Springs (Appellee's Brief, pp. 144–146, inclu-

sive), and prior to overt acts 1 to 7, inclusive.

## IV

We next consider appellants' point that publicity "read, seen and heard by the jury" resulted in an unfair trial.

A motion for mistrial was made on behalf of each defendant on Tuesday, January 28, 1964, after the conclusion of the prosecution's case on the previous court day (Friday, January 24, 1964). It was originally based on various newspaper stories and radio or television broadcasts of January 27th and 28th, 1964, referring to a bombing of a witness in Chicago (Exs. MM1–MM10). This motion was denied, but the jury was admonished not to read any papers or watch any television or listen to any radio (R.T. pp. 1915–16.) The court at that time declined to collectively or individually interview the jurors.

Thereafter other newspaper stories appeared (Ex's MM11–15) on January 29th and 30th, 1964. The motion for a mistrial was renewed, and the trial judge vacated his previous denial of the motion for mistrial, (R.T. p. 1992) re-opened the matter, and thereupon did individually interview each of the twelve jurors and the one alternate. Six of them had heard, read or seen nothing. Three had read one newspaper story; two had heard one television reference; one had had "a short discussion in the jury room" (sic); and one had heard a conversation outside the courthouse. None thought they had been influenced or prejudiced by anything read, heard or seen. At worst, those that obtained any knowledge knew that defendant Marshall, also known as Caifano, had something of a bad reputation in Chicago, and had been charged with complicity in some crime and would ultimately stand trial there. The court denied the motion for mistrial.

The next day the defendants once again renewed their motion for a mistrial (R.T. p. 2192). The motion was again denied (R.T. p. 2221). Exhibits MM15A

---

3. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); Esco Corp. v. United States, 340 F.2d 1000 (9th Cir. 1965).

and MM17–2 covering further January 29th and 30th stories were introduced in evidence.

First let it be said that nowhere in the newspaper or television accounts is there any reference to a specific *conviction* of any defendant. This, we think, in view of the language used in certain cases, is important.

Secondly, some of the alleged error is trivial.[4] But the newspapers did report Marshall's (or Caifano's) arrest in Las Vegas for failure to register "as an ex-felon." There were references to "the underworld"; to a "Cosa Nostra swindle trial," and to "the syndicate." It was after these references in newspapers and on television that the trial judge interrogated the jury, as suggested in United States v. Accardo, 298 F.2d 133 (7th Cir. 1962).

The Chicago Tribune of January 29, 1964, printed the story that the injured man, Lewis Barbe, "named Marshall Caifano, crime syndicate terrorist, as the man who engineered the bombing attempt on his life." There was no proof any juror saw, or had the opportunity to see, or read or hear this story. It was not repeated in any Los Angeles news media story, so far as Exhibits MM1–MM20 disclose, except one—the January 29th edition of the Hollywood Citizen-News (Ex. MM17), where it appeared in a slightly different and more condensed form.

Appellants rely upon Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959); Michelson v. United States, 335 U.S. 469, 475–476, 69 S.Ct. 213, 93 L.Ed. 168 (1948); United States v. Kum Seng Seo, 300 F.2d 623, 625 (3d Cir. 1962); Holmes v. United States, 284 F.2d 716, 718, 97 A.L.R.2d 782 (4th Cir. 1960).

■ In *Marshall*, supra, the Supreme Court quotes the precise newspaper story which "got before a substantial number of jurors" (360 U.S. at 311, 79 S.Ct. at 1172). Such an "exposure" was never established, factually, in this case. Both the Chicago Tribune and the Citizen-News stories came out *after* the interrogation of the jury by the district judge on January 29, 1964, and his detailed, precise and continuing instructions to the jury that they must read, hear or watch nothing connected with the Chicago bombing case. We must, and do, presume the court's instructions were followed. Sheppard v. Maxwell, 346 F.2d 707, 723 (6th Cir. 1965).

Of course, under the facts of the Marshall case, supra, the mere instruction by the court was held an insufficient cure. Any instruction can never be a certain cure, *under certain facts*. But as *Marshall* states (360 U.S. at 312, 79 S.Ct. at 1173), "The trial judge has a large discretion in ruling on the issue of prejudice resulting from the reading by jurors of news articles concerning the trial. Holt v. United States, 218 U.S. 245, 251, 31 S.Ct. 2, 6, 54 L.Ed. 1021. Generalizations beyond that statement are not profitable, because each case must turn on its special facts."

■ We think one further fact in this case should be commented upon. Here, in one story, Caifano was referred to as an ex-felon who failed to register as such when he went to Nevada during the weekend of January 25th to 29th. Whether he went to Nevada or not, we do not know. Whether he was an ex-felon or not, we do not know. But if both be true, he brought the matter on himself, and cannot complain if he was arrested, and the placing of such a charge against him was reported by news media. To hold that any defendant once a felon could thus require a mistrial of any pending trial at any time he thought advantageous to him, is carrying the protection of a defendant's alleged rights too far.

---

4. For example, appellants object to the newspaper's description of John Marshall as "Johnny Marshall, 52, formerly known as Marshall Caifano." (Appellant Marshall's Brf. p. 19.) Appellant Marshall was indicted in this proceeding as "John Marshall (also known as Marshall Caifano)." On arraignment, Marshall stated his true name was "as set forth in the indictment."

It is for this reason, we think, that the Supreme Court has suggested each case must rest on its own factual bottom. But we need not weigh this factor in this case, because of the lack of any evidence that this particular news story came to the attention of any juror.

Thus we are faced with an inability, on the record before us, to ascertain precisely what, *if anything,* concerning defendant Marshall (nothing was said in any news story about Del Monico) any one or more juror read, heard or saw; other than a general reference to a bombing of and serious injury to a witness in Chicago to events connected with a Cosa Nostra-insurance racket-syndicate-investigation in that city.

■■ We think it fair (when there can be no thought of the story coming through or from the prosecution) that the burden to show a defendant has been unfairly treated is on that defendant. Beck v. Washington, 369 U.S. 541, 558, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962). Here that burden has not been met.

■■ A sound discretion, to be judicially exercised, must still be permitted to exist in the trial courts. We think such was here exercised. Unlike United States v. Accardo, supra, the trial judge here did not refuse to properly admonish and instruct the jury concerning any newspaper stories. He endeavored to ascertain, by careful examination of each juror (each out of the presence of the others), the effect, if any, of anything read, heard or seen on those who had read, heard or seen anything about the Chicago bombing, and whether there had been any discussion within the jury as to it, and if so, to what extent. This was what *Accardo* suggested he should do. Had the district judge in *Accardo* done as much, we can presume there would have been no reversal. It would be useless to require such a procedure of the trial judge, and then pay no attention to his conclusions, made in the exercise of that discretion we are required to, and do, assume he possesses.

The facts of this case do not bring it within the rule of Holmes v. United States, supra, where a court official communicated with the jury. Nor do the facts in this case resemble those in Coppedge v. United States, 106 U.S.App.D.C. 275, 272 F.2d 504, 507 (1959). There "[n]o individual inquiry was addressed to these persons as to the possible influence of the [newspaper] articles [which they had read] upon each of them. Only a general and very brief inquiry was made of the jury as a whole." (272 F.2d at 508.) Nor was there any admonition not to talk to other jurors, as there was here.

In United States v. Kum Seng Seo, supra, the nonadmissible newspaper clipping was actually taken to the jury room, and its factual recital relied upon by one or more jurors. And see Holt v. United States, 218 U.S. 245, 251, 31 S.Ct. 2, 6, (1910), where Mr. Justice Holmes stated:

"* * * If the mere opportunity for prejudice or corruption is to raise a presumption that they exist, it will be hard to maintain jury trial under the conditions of the present day. Without intimating that the judge did not go further than we should think desirable on general principles, *we do not see in the facts before us any conclusive ground for saying that his expressed belief that the trial was fair and that the prisoner has nothing to complain of is wrong.*" (Emphasis added.)

From what the trial judge said in the full record before us (R.T. pp. 2193–2211) he felt the jury would not be prejudiced by what they had heard or read or seen or discussed—that "the jury will not be prejudiced and that the defendants will not be jeopardized by reason of this information."

As we said in Yates v. United States, 225 F.2d 146, (9th Cir. 1955), reversed on other grounds, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957): "The trial judge believed this jury could be trusted." It had received the individual interrogation, admonitions and instructions required. On well known principles relating to his better opportunity to observe and judge the intelligence, under-

standing and credibility of those persons he has personally interviewed, we will not, without substantial reason, substitute our own determination for that of the trial judge. We find no error.

## V

We turn to the alleged taint attached to the jury verdict arising from the "Special Police Badge" one juror possessed.

As worded by appellant Marshall, the question presented allegedly is:

"[Is] a defendant * * * denied a fair and impartial jury and deprived of his right to exercise peremptory challenges when a juror *conceals the fact* that he *carries* a special police officer's badge[?]" (Emphasis added.)

This is not a fair hypothetical question because it does not fairly state the facts. No juror was asked if he carried any kind of badge. Can it be fairly stated a person concealed a fact when no question concerning that fact was asked him? This is not an example of a prospective juror evading or concealing a fact, but

of defense counsel failing to ask a question they now wish they had asked.

One juror, Mr. Keasey, was in the courtroom when the entire panel was asked on voir dire by the trial court:

"Have any of you or are any of you now *employed* as a law enforcement or peace officer or police officer, or have you ever been, or has any member of your family ever been so employed?" (R.T. p. A53.) (Emphasis added.)

He remained silent. A motion for new trial was made upon the ground that had appellants known as much about Mr. Keasey before the verdict, as after, they would have peremptorily challenged him. (C.T. pp. 248, 311, 315, 319, 322.) This they had failed to do. (R.T. A108.)

There was a hearing on appellants' motion for new trial, and Mr. Keasey was called as a witness by and examined by appellants' counsel. He was then examined by government counsel, and by the trial judge (Supp. Tr. p. 23). Appellee has accurately summed up his testimony and the trial court's reaction to the charge of concealment of a material fact. We recite this summary in the margin and adopt it.[5]

---

5. "Mr. Keasey testified that he worked for the Pacific Telephone Company, and that he had previously been employed by the Glendale Parks and Recreation Department as a sports director, particularly with the badminton program. It was part of his job, insofar as it was possible, to keep undesirables out of the parks. Mr. Keasey had a badge, which he kept in his dresser drawer which said, 'Special Officer, Glendale Police Department'. It was the same kind of identifying badge that nearly all crossing guards and park attendants in Glendale have. He had been given the badge by a Lieutenant of the Traffic Bureau so that when he would be crossing through the parks and seeing how the activities were going, such as softball, volleyball, etc., he would have some identification of his position—like an arm patch. He had never been employed by the Glendale Police Department. He had no authority to arrest, and had never been given any official instructions by the Police Department other than that he was told, 'Don't get yourself in a spot that you can't—where you are going to get hurt. If you need help, call us and we'll take care of the situation.' He never worked on any case or in any activity where his badge was needed or used at the instructions of the Police Department. On New Year's Eve, in conjunction with the Parks Department, he has helped escort the City of Glendale float to the formation area for the Rose Parade in Pasadena.

"The trial court was satisfied that appellants were not prejudiced by Mr. Keasey's silence, in that his employment was not such as to require an affirmative response. The motions for new trial were denied.[4]

"Mr. Keasey's testimony makes very clear that he had never been employed as a law enforcement or peace officer, and that he never had the authority nor had he ever purported to act in the capacity of such a person. His job was supervising recreation activities and incident thereto he was charged by the Parks Department with seeing that the programs were conducted in an orderly fashion. The fact that he had been given

Thus there was not here a deliberate concealment on the part of a prospective juror of any fact, nor any attempt on Mr. Keasey's part to avoid or evade any question. Nor was any untruthful answer given by him. The facts here thus differ markedly from those in Clark v. United States, 289 U.S. 1, 53 S.Ct. 465, 77 L.Ed. 993 (1953), where the juror was "wilfully evasive and knowingly untrue." The only question asked was as to the juror's *employment;* in failing to advise of his nonemployment, the silence did not "deceive or mislead the court," Consolidated Gas & Equipment Co. of America v. Carver, 257 F.2d 111 (10th Cir. 1958), nor did he dishonestly "conceal a material fact," Carpenter v. United States, 69 App.D.C. 306, 100 F.2d 716, 717 (1938).

Appellant urges that this court's opinion in Cavness v. United States, 187 F.2d 719 (9th Cir. 1951), "does not detract from appellants' argument here." We think it does, because it holds the failure of the juror in Cavness to disclose he was a reserve police officer does *not* disqualify him for cause. (There the reserve officer did not respond when the entire panel was asked as a whole if any were or had been reserve police officers.) If not disqualified for cause, he had no duty to voluntarily reveal his reserve status—merely to voluntarily bring to the court's attention any fact which *would* disqualify him for cause and to honestly answer all questions that might be propounded to him concerning any facts that might be the basis for a peremptory challenge. He was asked no questions on individual voir dire.

To grant the result here sought by appellants would result in utter chaos in every jury trial—for without counsel for appellants asking a single question on voir dire, a voluntary disclosure of hundreds of factual situations by each juror would be required, without the juror having any knowledge or indication of what factual situations he was required to relate.

We agree with the court in State v. Simmons, 59 Wash.2d 381, 368 P.2d 378, 384 (1962), that "[w]here a person serves on a jury who, if not excused for cause, would certainly have been peremptorily challenged if certain questions on *voir dire had been answered truthfully,*

the 'Special Officer's' badge did not confer any official status or duties nor did it constitute any sort of 'employment' within the meaning of the Court's inquiry. Mr. Keasey was employed by the Park Department and none other.
4. In denying appellants' motions for new trial, the trial court stated the following:
'Now, I think the only problem concerning Mr. Keasey is he has testified on the stand under oath and, I think, under circumstances which are most apt to bring about a truthful statement that he was never a police officer; that he has never been engaged in police activities or any activities under the direction or control of any police organization.
'If he made statements contrary to that over a few drinks in a social atmosphere, I think we are interested not so much in the fact that he may have made contrary statements as we are interested in what the facts are. And he has testified under oath here that he was never a police officer. I think we are entitled to believe him,

and I do. I find that he was never a police officer; that he was employed by the City as a director of sports in connection with the Park Department; that he was given a special police officer's badge in order that he might more perfectly carry out the functions of the sports director in the case that he had ever needed some badge of authority. I assume that if he had a badge saying, "Authorized Sports Director" it might have been sufficient. But they didn't see fit to give him that kind of a badge, they gave him a special police officer's badge.
'And from his own testimony he has never participated in any police work of any kind for pay or otherwise. That being the case, I feel that this statement that he gave at the time of the *voir dire* examination is a true and correct one, that he did not lie, and that eliminates the discussion as to whether or not the defendants had been prejudiced by not having had the opportunity to use this peremptory.' "
(Appellee's Brf. pp. 75–78.) (References to the Transcript omitted.)

it has been held to be an abuse of discretion not to grant a new trial." (Emphasis added.) Here, nothing but "truthful silence" existed; and we find no error.

## VI

We next come to two evidentiary points we consider of lesser importance.

1. The admission of evidence as to Ray Ryan's "subjective emotional feelings."

2. The admission of evidence from the prosecution witness of testimony it allegedly believed not to be the truth.

As to the first evidentiary error charged, no cases are cited by appellant Marshall, and appellant Del Monico does not specifically raise the point.

■■■ Extortion is defined in California by § 518 of the Penal Code; in Nevada by Title 16, §§ 205.315–25, Revised Statutes. Each requires force, or threat of force, or injury, to accomplish extortion. "Fear" is expressly referred to in the California Statute. A threat is the expression of an intention to inflict evil or injury on another. To ascertain if it produced fear, i. e., if the threat were successful—may well have gone beyond the strict statutory requirements of Nevada. The government may have proved more than it had to—but we do not think such a conclusion is required. Under Nevada law, the act so done by the victim may be done against his will because of threats; and the presence of fear is proof that the threats were effective, and that because of such fear his volition was overcome—that threats produced fear that caused the victim's will to be overcome.

We think the colloquy between court and counsel after the testimony that Del Monico struck Ryan on the automobile ride to Palm Springs Airport pointed out the purpose and validity of the evidence. Was it a "playful tap" made in jest or a "purposeful poke" intended to produce fear?

We have approved the introduction of such evidence in Carbo v. United States, 314 F.2d 718, 740–741 (9th Cir. 1963). cert. den. 377 U.S. 953, 84 S.Ct. 1625, 12 L.Ed.2d 498, rehearing denied 377 U.S. 1010, 84 S.Ct. 1903, 12 L.Ed.2d 1058 (1964), wherein we said:

"To prove a substantive act of extortion it is essential to show the generation of fear in the victim. To prove a substantive act of attempted extortion it is necessary to prove an attempt to instill fear. To prove a conspiracy to extort it is necessary to show a plan to instill fear."

Cf. also: Cole v. United States, 327 F.2d 360 (9th Cir. 1964); Nick v. United States, 122 F.2d 660 (8th Cir.), cert. den. 314 U.S. 687, 62 S.Ct. 302, 86 L.Ed. 550, rehearing denied, 314 U.S. 715, 62 S.Ct. 411, 86 L.Ed. 570 (1941); Bianchi v. United States, 219 F.2d 182 (8th Cir.), cert. den. 349 U.S. 915, 75 S.Ct. 604, 99 L.Ed. 1249, rehearing denied, 349 U.S. 969, 75 S.Ct. 879, 99 L.Ed. 1290 (1955). We find no error.

■■■ Appellants' second evidentiary point arises through the government calling Nicholas Dandolas as a witness. After calling "Nick the Greek" to testify, the government argued to the jury that his testimony was untrue. This, say appellants, prevented them from having a fair trial.

Five cases are cited in support of this position. They are all cases where the government, *knowing the testimony was false,* introduced it before the jury or permitted it to go into evidence, and *asked or permitted the jury to believe it,* in order to procure a conviction. In Mooney v. Holohan, 294 U.S. 103, 110, 55 S.Ct. 340, 79 L.Ed. 971, 98 A.L.R. 406 (1935), "the sole basis of his [petitioner's] conviction was perjured testimony, which was knowingly used by the prosecuting authorities in order to obtain that conviction, and also that these authorities deliberately suppressed evidence which would have impeached and refuted" the false testimony. Pyle v. State of Kansas, 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214 (1942), stands for the same principle. In Alcorta v. State of Texas, 355 U.S. 28, 78 S.Ct. 103, 2 L.Ed.2d 9 (1957), the district attorney advised a witness not to volunteer any information

about a fact which the witness had lied about, and denied, on the stand (adultery with the defendant's wife). The prosecutor admitted the advice had been so given to the witness. In Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L. Ed.2d 1217 (1959), the principal state witness, an accomplice, had been promised consideration in return for his testimony. The prosecutor knew this, but remained silent when the witness denied it on the stand. In Brady v. State of Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the prosecution in a murder trial knowingly withheld from defendants knowledge of the existence of a confession obtained from a companion tried separately, that he had actually fired the fatal shot. Held: defendant's sentence was subject to review in a new trial because of denial of due process. In United States v. Wilkins, 326 F.2d 135 (2d Cir. 1964), the prosecution suppressed evidence favorable to the defendant in a robbery case.

But Nicholas Dandolas was something more to this case than another witness called by the prosecution. He was an unindicted coconspirator, named in the indictment as such. The government, in order to escape any possible charge of failing to supply the jury with all possible evidence of the circumstances surrounding the crime charged, called Dandolas by reason of his involvement therein, or (perhaps) his alleged involvement therein. Here government counsel correctly states they "neither suppressed the truth nor offered prepared testimony as the truth"; nor did they fail to attack, both in other testimony and on argument, any of Dandolas' testimony they thought was untrue.

Prosecutors have a narrow line to walk in avoiding possible perjured testimony, and yet are required to present "all the material evidence" within their knowledge, irrespective of the source, even though there appears to be sound reason to doubt its accuracy. Cf. Thomas v. United States, 343 F.2d 49 (9th Cir. 1965); Orebo v. United States, 293 F.2d 747 (9th Cir. 1961).

The prosecution has the best chance to stay within the prescribed narrow path by permitting the jury to hear

"the testimony of all persons of competent understanding who may seem to have knowledge of the facts involved in a case, leaving the credit and weight of such testimony to be determined by the jury or by the court, rather than by rejecting witnesses as incompetent." Rosen v. United States, 245 U.S. 467, 471, 38 S.Ct. 148, 150, 62 L.Ed. 406 (1918).

Fairness is an element of due process, and we discern no element of unfairness in calling Dandolas as a witness, and then questioning certain parts of his testimony.

What was here done cannot be tortured into a prosecutor's scheme (as counsel for Del Monico would have us believe) "to prove the defendants guilty by producing a witness to testify falsely (for the defendants)." (Appellant Del Monico's Brf. p. 46.)

## VII

Appellant Del Monico presents a further point: that the government attorney's "pointing up" the appellant's failure to take the stand was error.

We find no place in the record, nor has it been pointed out to us, where counsel for the government asked the jury to consider that neither defendant took the stand on his own behalf. This explains perhaps the use of the term "pointing up." The failure was "pointed up," urges counsel for Del Monico, because counsel for the government, in answering counsel for defendant's argument "pointed to the witness Ryan," and argued *in effect* that defendants "had conceded the truth of Ryan's testimony of the conversations had with the defendants."

Although neither defendant took the stand, counsel for Del Monico proceeded in his argument to make admissions *on behalf of his client* (R.T. pp. 2425–2426; 2440–2441). These admissions were not restrictive in their nature. "We admit everything every witness said except Raymond Ryan." (R.T. pp. 2455; 2441;

2443.) In reply government counsel pointed out the defendants were required to rely on Ryan's testimony that the defendants were "collecting" for Dandolas. "There is no one else that even testified on the subject." (R.T. pp. 2575–2576.)

This says Del Monico, "points up" his failure to take the stand. Because it was preceded in argument by the prosecutor pointing out that Dandolas had denied defendants were collecting for him and that neither counsel for defendants had cross-examined Dandolas on the subject, we can assume that Mr. Sheridan, counsel for the government, was obviously referring to this question of authorization, if any, from Dandolas to defendants to "collect" for Dandolas. Counsel for codefendant Marshall so recognized it as comment on Dandolas' testimony (R. T. p. 2580).

The cases relied upon by Del Monico in the main involve a direct specific comment on defendant's failure or refusal to take the stand. Stewart v. United States, 366 U.S. 1, 81 S.Ct. 941, 6 L.Ed.2d 84 (1961); De Luna v. United States, 308 F.2d 140 (5th Cir. 1962); Leathers v. United States, 250 F.2d 159 (9th Cir. 1957); Langford v. United States, 178 F.2d 48 (9th Cir. 1949); Linden v. United States, 296 F. 104 (3d Cir. 1924).

We are not quick to rely on a statement which merely, or perhaps incidentally, "points up" defendant's failure to take the stand, where no direct comment is made to that effect. In *Langford,* supra, we stated (178 F.2d at 55):

> "[E]xcept in those special cases where it appears that the accused himself is the only one who could possibly contradict the government's testimony, * * * the prosecutor may properly call attention to the fact that the testimony of the government witnesses has not been contradicted. * * *"

Interpreting the Supreme Court's holding in Stewart v. United States, supra, which precludes any comment or argument about a failure of a defendant to take the stand in "the light of reason," we conclude the language used was not "manifestly intended [to be] or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." United States v. Wright, 309 F.2d 735, 738 (7th Cir. 1962).

Further, the court's instructions on the subject were clear, forceful and proper. (R.T. p. 2643.)

## VIII

Finally, appellant Del Monico objects to the failure to give (1) defendant's requested instruction No. 8 (R.T. 266–267), and (2) certain requested definitions. Instruction No. 8 required a "close scrutiny" of testimony where the case stands or falls on it. The court gave other ample proper cautionary instructions (R. T. pp. 2636–2637). And we see no reason to define the words concerning which definition was refused. We find no merit in either objection.

The judgments of conviction are affirmed.