**Robert Lynn MARTIN and Maurice Daniel Dodson, Appellants,**

v.

**UNITED STATES of America, Appellee.**

No. 23828.

United States Court of Appeals Fifth Circuit.

Jan. 25, 1968.

As Modified on Denial of Rehearing March 5, 1968.

Morris A. Shenker, John L. Boeger, St. Louis, Mo., Edward Bennett Williams, Robert L. Weinberg, Barbara Allen Babcock, Washington, D. C., for appellants.

James R. Gough, Asst. U. S. Atty., Morton L. Susman, U. S. Atty., Owen A. Neff, Special Asst. U. S. Atty., Houston, Tex., for appellee.

1. The motion of Seaboard to strike the appendix to Golden Gate's Reply Brief and Correspondence of counsel, is granted.

Before JONES, WISDOM and DYER, Circuit Judges.

WISDOM, Circuit Judge.

The narrow question for review is the constitutionality of the Federal Anti-Wagering Law, 18 U.S.C. § 1084,[1] as applied in the circumstances of this case.

The appellants were convicted for transmitting wagers and wagering information by telephone in interstate commerce—between Houston, Texas and Las Vegas, Nevada. They waived trial by jury and stipulated with government counsel that the factual allegations of count 3 of the indictment were true.[2] It was also stipulated that all of the telephone calls upon which count was predicated were made *from* Houston *to* Las Vegas. The appellants were convicted upon the stipulated record and appealed to this Court [3] on the sole issue of the constitutionality of section 1084. We find that section constitutional as applied to the transmission of wagers from Texas to Nevada and thus affirm the judgment of the district court.

\* \* \*

This is not the first constitutional attack on section 1084. Without exception, however, the attack has failed. Section 1084 is (1) within the scope of Congressional power under the commerce clause (United States v. Kelley, S.D.N.Y. 1966, 254 F.Supp. 9; United States v. Borgese, S.D.N.Y.1964, 235 F.Supp. 286); (2) not contrary to the First Amendment (United States v. Kelley; United States v. Borgese; United States v. Smith, E.D.Ill.1962, 209 F.Supp. 907); (3) not void for vagueness (United States v. Borgese; United States v. Smith); and (4) not in derogation of the police power reserved to the states through the Tenth Amendment (United States v. Kelley; United States v. Borgese). It has been held constitutional even when applied to transmission of wagers between two points in the same state when the transmission crosses state borders. United States v. Yaquinta, N.D. W.Va.1962, 204 F.Supp. 276. In the most recent case involving interpretation of section 1084, its constitutionality was not even challenged. Sagansky v. United States, 1 Cir. 1966, 358 F.2d 195. Furthermore, section 1952, a complementary enactment prohibiting travel or transportation in aid of racketeering enterprises,

1. 18 U.S.C. § 1084:
   (a) Whoever being engaged in the business of betting or wagering knowingly uses a wire communication facility for the transmission in interstate or foreign commerce of bets or information assisting in the placing of bets or wagers on any sporting event or contest, or for the transmission of a wire communication which entitles the recipient to receive money or credit *as a result of bets or wagers*, or for information assisting in the placing of bets or wagers, shall be fined not more than $10,000 or imprisoned not more than two years, or both.

2. "That from on or about September 20, 1963, and continuously thereafter until on or about January 1, 1965, MAURICE DANIEL DODSON and ROBERT LYNN MARTIN, the defendants, being then and there engaged in the business of betting and wagering, did knowingly use a wire communication facility, that is, the telephone, and did knowingly and wilfully aid, abet, counsel, command, in-

duce, procure and cause the use of a wire communication facility, that is, the telephone, for the transmission in interstate commerce between Las Vegas, Nevada, and Houston, Texas, in the Houston Division of the Southern District of Texas, of bets and wagers on sporting events and contests, that is, football games, and of information assisting in the placing of bets and wagers on sporting events and contests, that is, football games."

3. Appellant Martin petitioned for certiorari following his motion in this Court to hold his appeal in abeyance. His petition asserted that his sole point of appeal turned upon a *constitutional issue* before the Supreme Court in United States v. Fabrizio, subsequently decided, 1966, 385 U.S. 263, 87 S.Ct. 457, 17 L.Ed.2d 351. Certiorari was denied. 385 U.S. 1008, 87 S.Ct. 715, 17 L.Ed.2d 546. As we suggest below, *Fabrizio* strongly supports the result here reached, although different violations of different sections were involved.

uniformly has been upheld throughout various constitutional attacks.[4]

We are here presented with a new thrust: The appellants argue that since they were convicted for transmitting wagers to Nevada, where such wagering is legal, section 1084 is being applied unconstitutionally "to defeat the policies of Nevada while not aiding the enforcement of the laws of any other State." We find that the contentions upon which this constitutional argument is based are erroneous, misleading, and irrelevant.

## I.

There is no denying that Nevada favors legal gambling of almost any kind; gambling represents perhaps its most obvious and pervasive state-fostered institution.

"Nevada's principal industry, we say is tourism. The tourists come for many reasons to the State of Nevada. * * * Now it would be less than candid to say a great many people do not come into our State because we have some forms of legal gambling that other states do not have. * * * It is a way of life." Statement of Governor Grant Sawyer, of Nevada, on NBC Television "White Paper", Sept. 6, 1966.

Strictly speaking, therefore, any denial of the channels of interstate commerce into or out of Nevada to the wagering world can be considered contrary to the policy of that state.

The appellants' argument assumes that application of section 1084 in this case does not aid the enforcement of the laws of Texas. The relevant Texas statute provides:

No person in this State shall enter into an agreement with another, either orally, written or implied, whereby either one or both shall bet or wager money or anything of value, or otherwise become a party to any gambling scheme based upon the final result or outcome of any play or portion thereof of a game of baseball or football. Vernon's Ann.Tex.P.C. art. 646 (1952).

The appellants suggest that this statute apparently would be inapplicable to wagers not concluded in Texas and, since wagers are contracts, United States v. Calamaro, 1957, 354 U.S. 351, 355, 77 S.Ct. 1138, 1 L.Ed.2d 1394, and a contract is made where accepted, the wagers in question were made in Nevada, not Texas. Corbin, Contracts § 79 (1952). Although this logical progression itself may be open to question, we may even assume its validity and yet arrive at a result contrary to that propounded by the appellants. For the Texas statute refers to wagering by a "person in this State"; had the legislature desired the construction asserted by the appellants, the article would have been written to prohibit entering "into an agreement in this State".[5]

---

4. Section 1952 has been held (1) within the scope of Congress' power under the commerce clause, Marshall v. United States, 9 Cir. 1966, 355 F.2d 999; United States v. Zizzo, 7 Cir. 1964, 338 F.2d 577; United States v. Ryan, D.Colo. 1963, 213 F.Supp. 763; (2) not void for vagueness or otherwise violative of due process, Turf Center, Inc. v. United States, 9 Cir. 1963, 325 F.2d 793; Bass v. United States, 8 Cir. 1963, 324 F.2d 168; United States v. Teemer, N.D.W. Va.1963, 214 F.Supp. 952; United States v. Ryan, supra; United States v. Barrow, 3 Cir. 1966, 363 F.2d 62; and (3) not in derogation of the police power reserved to the states through the Tenth Amendment, United States v. Barrow,

supra; Marshall v. United States, supra; United States v. Ryan, supra.

5. Vernon's Ann.Tex.Rev. arts. 646a and 468 make it illegal to bet on dog races or horse races held in Texas or *elsewhere*. The appellants argue from this that Texas meant to distinguish between betting on races held out of state and betting on football or baseball games held out of state. This conclusion is erroneous because (1) article 646 is neither patently nor latently ambiguous, and thus there is no need to resort to in pari materia constructions, and (2) the various Texas anti-wagering statutes and anti-gaming statutes reflect a strong state policy opposing participation in such activities by

## II.

▮ Reference to Nevada's policies in the context of enforcement of this section is misleading. For it is clear that if the policy of Nevada is not "defeated" in some way, then the policy of every other state that prohibits what Nevada allows could be defeated. As Senator Morrill pointed out in the debate on the 1876 anti-lottery statute:

> [I]t is obvious that if thirty-six States were to make the most penal statutes against lotteries, and the mails were open to one that allowed lotteries, the laws of the thirty-six States would be rendered nugatory, because all the people of the thirty-six States could obtain their tickets from this one State as well as though they were authorized from the whole. Therefore if the matter is allowed to run through the mails, any laws by any State against lottery tickets are entirely valueless.

Furthermore, assistance to the states directly [6] was only part of the reason for enactment of section 1084. This section was part of an omnibus crime bill that recognized the need for independent federal action to combat interstate gambling operations.[7] Other sections prohibited interstate transportation of gambling paraphernalia, 18 U.S.C. § 1953, interstate transportation of gambling machines, 15 U.S.C. § 1171, and interstate travel in aid of racketeering, 18 U.S.C. § 1952. Moreover, this series of legislation does not stand alone, but appears as part of an independent federal policy aimed at those who would, in furtherance of any gambling activity, employ any means within direct federal control.[8]

---

persons at the time located within the boundaries of the state. The appellant's reliance on *Jacobs v. Hyman*, 5 Cir. 1923, 286 F. 346, and *Castilleja v. Camero*, Tex.1967, 414 S.W.2d 424, is misplaced. *Jacobs* involved a suit to enforce a contract made outside Texas (and legal where made) by a Texas resident, where under Texas law the contract was "a wagering contract, the enforcement of which was contrary to the public policy of the state of Texas, and invalid and unenforceable in the courts sitting in Texas." 286 F. at 348. *Castilleja* involved a suit to enforce an agreement concerning distribution of the proceeds from a lottery prize, the establishment of a lottery or the sale of a lottery ticket being unlawful under Tex.Rev.Pen.Code Ann. art. 654. The plaintiffs recovered in both cases. But neither case involved conduct by the plaintiffs which was itself illegal under Texas law. Here article 646 provides clearly that the appellants' conduct was unlawful.

6. "The purpose of this legislation is to assist the various States, territories, and possessions of the United States and the District of Columbia in the enforcement of their laws pertaining to gambling, bookmaking, and like offenses and to aid in the suppression of organized gambling activities by prohibiting the use of or the leasing, furnishing, or maintaining of wire communication facilities which are or will be used for the transmission of certain gambling information in interstate and foreign commerce." Letter from Attorney General Robert F. Kennedy to Speaker of the House of Representatives, April 6, 1961, 2 U.S.Code & Congr. News, 87th Congr., 1st Sess., pp. 2631, 2633. See also The Attorney General's Program to Curb Organized Crime and Racketeering, Hearings, Sen. Comm. on the Judiciary, 87th Congr., 1st Sess. on S. 1653, etc.; Legislation Relating to Organized Crime, Hearings, Subcommittee No. 5 of the House Comm. on the Judiciary, 87th Congr., 1st Sess. on H.R. 468, etc.

7. Section 1084 was one of a series of bills designed to form a unified federal statutory attack on organized racketeering. The Kefauver crime hearings of 1950 and 1951 had brought to national attention the vast scope and power of racketeers who carried on their activities throughout the United States on a highly organized, interstate basis. Hearings Before a Senate Special Committee to Investigate Organized Crime in Interstate Commerce, 81st Congr., 2d Sess. 1950, 1951. These hearings and the investigations that followed constituted the evidentiary background for the Congressional hearings of 1961, cited in note 6, supra, which resulted in the passage of section 1084. See generally Johnson, Organized Crime: Challenge to the American Legal System, 53 Crim.L., C. & P.S. 399 (1962), 54 Crim.L., C. & P.S. 1 (1963). See also Ezell, Fortune's Merry Wheel (1960).

8. See, e. g., 18 U.S.C. §§ 1081–1083 (prohibiting gambling on ships or airplanes owned by American citizens in areas of

### III.

The appellants' reference to state policy constitutes a challenge to Congressional power under the commerce clause to enact legislation that may contravene Nevada policy. It is in this constitutional context that reference to state policy becomes irrelevant.

■ The power of Congress under the commerce clause has been amply and ably discussed in legal literature.[9] That power clearly extends to an absolute prohibition, regardless of state public policy, Champion v. Ames, 1903, 188 U.S. 321, 23 S.Ct. 321, 47 L.Ed. 492, just as it does to an absolute absence of regulation, Brown v. Houston, 1885, 114 U.S. 622, 5 S.Ct. 1091, 29 L.Ed. 257. Congress has exercised that power to regulate—or prohibit, as the case may be—transportation of various articles, transmissions of various sorts, and travel of persons for various purposes in interstate commerce.[10] These regulations and prohibitions have been uniformly upheld.

■ Just as Congress has the power to prohibit all interstate shipments of intoxicants, Clark Distilling Co. v. Western Md. Ry., 242 U.S. 311, 37 S.Ct. 180, 61 L.Ed. 326, it also has the power to prohibit *all* interstate transmission of wagers. It cannot follow, therefore, that Congress does not have the power to prohibit *some* interstate transmission of wagers. Clark Distilling Co. v. Western Md. Ry., supra. In United States v. Fabrizio, 1966, 385 U.S. 263, 87 S.Ct. 457, 17 L.Ed.2d 351, the Supreme Court upheld section 1953 as applied to paraphernalia related to a legal lottery, specifically, the state-run New Hampshire lottery. Despite New Hampshire's efforts, as amicus, to have the statute limited only to *illegal* lotteries, the Court recognized that this limitation would defeat one of the principal purposes of the section in that it would allow New Hampshire lottery acknowledgments to pass freely into states with local laws against lottery. 87 S.Ct. 457, 17 L.Ed.2d at 357.[11] Surely this decision is in many

federal jurisdiction) ; 15 U.S.C. §§ 1173–1178 (requiring registration of manufacturers and dealers of gambling devices) ; 18 U.S.C. §§ 1301–1303 and 19 U.S.C. § 1305 (prohibiting, importing, transporting, or mailing lottery tickets and related matter) ; 18 U.S.C. § 1304 (prohibiting broadcasting of lottery information) ; 26 U.S.C. § 5723(c) (prohibiting lottery material in packaged tobacco, cigars, or cigarettes) ; and Pub.L. No. 90–203, § 5136A (Dec. 15, 1967) (prohibiting banks from fostering or participating in gambling activities). Cf. New York Times, Dec. 24, 1967 § 1, at 48, col. 4 (city ed.), where an executive director of a Las Vegas casino association called a hostile tax ruling "another phase of the Federal Government's continuing attack on Nevada gambling".

9. E. g., 1 Schwartz, The Powers of Government 222 (1963) ; Corwin, Congress's Power to Prohibit Commerce—A Crucial Constitutional Issue, 18 Cornell L.Q. 477 (1933) ; Cushman, National Police Power Under the Commerce Clause, 3 Minn. L.Rev. 289, 381, 452 (1919) ; Parkinson, Congressional Prohibitions of Interstate Commerce, 16 Colum.L.Rev. 367 (1916) ; Sutherland, Is Congress a Conservator of the Public Morals?, 38 Am.L.Rev.

194 (1904) ; Whitney, The Latest Development of the Interstate Commerce Power, 1 Mich.L.Rev. 615 (1903) ; Comment, Regulation of Gambling Devices in Interstate Commerce, 4 DePaul L.Rev. 256 (1955) ; Note, Federal Control Over Crimes—Scope of Power To Regulate Crime Under the Commerce Power, 32 Mich.L.Rev. 378 (1934). See also Stern, The Commerce Clause and the National Economy, 1933–1946, 59 Harv.L.Rev. 645, 947 (1946).

10. See, e. g., the statutes collected in Note, Federal Control Over Crimes, supra note 9 at 355–56 n. 28 and in Kauper, Constitutional Law—Cases and Materials 157–58 (1960).

11. Section 1953 contains an exception to "the transportation of betting materials to be used in the placing of bets or wagers on a sporting event *into a State in which such betting is legal* under the statutes of that State". 18 U.S.C. § 1953(b). Section 1953 contains no such exception regarding transmission of wagers into states where such wagers are legal, thus suggesting congressional intent on this issue. Section 1084 does contain an exception for transmission between states where wagering is legal in *both* states.

ways in derogation of New Hampshire's policy to promote its lottery.[12] Similarly, of course, the repercussion in states with no (or a low) minimum wages and hours laws did not inhibit Congress from constitutionally prohibiting from interstate commerce material produced in nonconforming conditions. United States v. Darby, 1941, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609. As the Supreme Court had earlier pointed out:

> The power of Congress under the commerce clause of the Constitution is the ultimate determining question. If the statute be a valid exercise of that power, how it may affect persons or states is not material to be considered. It is the supreme law of the land, and persons and states are subject to it. Hoke v. United States, 1913, 227 U.S. 308, 33 S.Ct. 281, 57 L.Ed. 523.

In short, Section 1084 is valid as applied to the facts of this case. The appellants' convictions must stand. The judgment of the district court is affirmed.

---

12. Approximately 87% of the winners in the 1964 New Hampshire Sweepstakes resided out of state. See 110 Cong.Rec. A5494. Winners in both the 1964 and 1965 Sweepstakes were from over 34 states, the District of Columbia, and various foreign countries. See New Hampshire Sweepstakes Comm'n, New Hampshire Sweepstakes Program 9 (1965).