UNITED STATES of America

v.

Walter ZIRPOLO, Robert E. Jacks, Colonial Pipeline Company, Karl T. Feldman, Glenn H. Giles, Ben D. Leuty, Rowland Tompkins Corporation, Bechtel Corporation, Gates Construction Corporation, Gates Equipment Corporation, Defendants.

Cr. A. No. 75–67.

United States District Court
D. New Jersey.

Aug. 1, 1968.

David M. Satz, Jr., U. S. Atty., Philip T. White, Washington, D. C., Herbert J. Stern, New York City, Thomas Henderson, Alabama, Department of Justice, for the Government.

Crummy, Gibbons & O'Neill, by Matthew P. Boylan, Newark, N. J., for Glenn H. Giles.

Pindar, McElroy, Connell & Foley, by Adrian M. Foley, Jr., Newark, N. J., for Karl T. Feldman.

Shanley & Fisher, by Frederick B. Lacey, Newark, N. J., for Bechtel Corporation.

Williams & Connolly, by Edward Bennett Williams, Robert L. Weinberg, Washington, D. C., for Walter Zirpolo.

Toolan, Romond & Burgess, by John E. Toolan, Arthur W. Burgess, Perth Amboy, N. J., for Robert E. Jacks.

Wilentz, Goldman & Spitzer, by Frederick K. Becker, Perth Amboy, N. J., for Colonial Pipeline Co.

Van Riper & Belmont, by Walter D. Van Riper, Frederic C. Ritger, Jr., Newark, N. J., for Gates Construction Corp. and Gates Equipment Corp.

Paul, Weiss, Rifkind, Wharton & Garrison, by Simon Rifkind, Paul Newlon, New York City, for Ben D. Leuty.

Lawler, Sterling & Kent, by Joseph E. Brill, New York City, for Rowland Tompkins Corp.

## OPINION

**WORTENDYKE, District Judge:**

The Nine Count Indictment, filed in this case on February 23, 1967, has been made the target of over forty pretrial motions in behalf of the ten several defendants charged therein. By way of general introduction to the succeeding nine Counts into which the offenses charged against the defendants are divided, the Indictment alleges that, at all times mentioned therein, Walter Zirpolo was Mayor of the Township of Woodbridge, New Jersey, and a voting member of the Planning Board thereof, and Robert E. Jacks was a Committeeman representing the Third Ward of the Township, a voting member of its governing body, and, subsequent to January 1, 1964, President of its Municipal Council. Jacks was also the owner of a single proprietary business in the municipality. Colonial Pipeline Company (hereinafter Colonial) was a Delaware corporation, with principal offices in Atlanta, Georgia. Karl T. Feldman was Executive Vice President, Glenn H. Giles was Manager of Construction and Ben D. Leuty was President of Colonial. Rowland Tompkins Corporation, formerly known as Rowland Tompkins & Son, Inc., was a New York Corporation, and Howard Tompkins and Ralph A. Bankes (unindicted co-conspirators) were respectively President and Vice President of that corporation. Bechtel Corporation (hereinafter Bechtel Corp.) was incorporated in the State of Delaware, but had its principal office in San Francisco, California; and Harry F. Waste, Robert L. Bowman and William L. J. Fallow (unindicted co-conspirators) were respectively Vice President and employees of Bechtel Corp. Gates Construction Corporation (hereinafter Gates Const. Corp.) and Gates Equipment Corporation (hereinafter Gates Equip. Corp.) were New Jersey corporations, and Robert S. Gates (an unindicted co-conspirator) was President of those corporations.

In Count 1 the Grand Jury charges that between January 1, 1963 and December 31, 1964 the defendants Zirpolo, Jacks, Colonial, Giles, Feldman, Leuty and Rowland Tompkins Corporation, together with Howard Tompkins and Ralph A. Bankes (who are not named as defendants in the Indictment) knowingly, wilfully and unlawfully combined and conspired with each other, and with a representative of Rowland Tompkins Corporation, to commit certain offenses against the United States of America in violation of 18 U.S.C. § 1952 in that:

"[T]he defendants and said co-conspirators would travel and wilfully cause others to travel in interstate commerce and * * * use and wilfully cause others to use facilities in interstate commerce, including telephones and the mails, * * * with the intent to promote, manage, establish and carry on and facilitate the promoting, managing, establishing and carrying on of an unlawful activity, * * * being the obtaining of a building permit by bribery of officials of the Township of Woodbridge, New Jersey, in violation of * * * N.J. S. 2A:93-6, * * *."

It is further alleged that, as parts of said conspiracy, Colonial would request the assistance of Zirpolo in obtaining a building permit from the Township of Woodbridge, New Jersey, for erection of 22 petroleum storage tanks within the Third Ward of the Port Reading Section of said Township; Zirpolo would inform Colonial that its application for the building permit would be opposed by residents of the area for which the permit was sought; and that Colonial would agree not to file its application for the building permit until after the November 5, 1963 elections, in which Zirpolo was a candidate for reelection as Mayor, for the reason that Zirpolo and Jacks had promised their constitutents that no additional petroleum tanks would be erected in that section of the munici-

pality. The Indictment further alleged that, as an additional part of the conspiracy complained of, Zirpolo would arrange for a meeting by Colonial's employee Stewart with Jacks at the latter's place of private business in Woodbridge, and that Jacks would inform Stewart that the then existing municipal government administration of Woodbridge could, if reelected, aid Colonial in securing its building permit after the November 5, 1963 election, without which aid Colonial's building application might be defeated because of opposition of the residents of the Port Reading Section of the municipality which had been expressed at a public hearing before the Planning Board thereof.

It is further charged that it was also a part of the conspiracy that Jacks would, on behalf of himself, Zirpolo and other persons unknown to the Grand Jury, solicit from Colonial, through its employee Stewart, the sum of $50,000 as a campaign contribution in return for aiding Colonial after the November 5, 1963 elections in securing a building permit from the Township over the opposition of the objecting residents of the Port Reading Section of the municipality.

The Indictment also charged that it was a part of the conspiracy that defendants Giles, Feldman and Leuty, acting in behalf of Colonial, would agree among themselves, and with other persons to the Grand Jury unknown, to transmit the sum of $50,000 from the office of Colonial in Atlanta, Georgia, to Zirpolo and Jacks in Woodbridge, New Jersey, and to other persons to the Grand Jury unknown, for the purpose of procuring the assistance of Zirpolo and Jacks in obtaining the building permit from the Township.

It was also a part of the conspiracy that Colonial, Giles, Feldman, Leuty, Rowland Tompkins, Zirpolo and Jacks, and the unindicted co-conspirators Tompkins and Bankes, together with a representative of Rowland Tompkins, would agree among themselves, and with

divers other persons to the Grand Jury unknown, to travel in interstate commerce and to use and to cause the use of facilities therein, including the mails and the telephone, for the purpose of transmitting the aforesaid $50,000 from Colonial's office in Atlanta, Georgia to the office of Rowland Tompkins in Hawthorne, New York, and thence to Zirpolo and Jacks in Woodbridge, New Jersey, in three installments; that the first payment of $20,000 would be due on or about November 6, 1963; the second payment of $15,000 would be due after a building permit had been issued to Colonial by the Township of Woodbridge, and that the third payment of $15,000 would be due after a certificate of occupancy had been issued to Colonial by the Township.

It is finally alleged that it was further a part of the conspiracy that the defendants would make and cause to be made false and fictitious documents, and would perform other acts, for the purpose of hiding and concealing, and causing to be hidden and concealed, the purpose of, and acts done in furtherance of the conspiracy, in violation of 18 U.S.C. § 371.

Following the foregoing allegations of conspiracy, the Indictment particularizes a series of nineteen (19) overt acts, commencing on or about August 16, 1963 and terminating on or about November 27, 1964.

Counts 2 through 5 set out the substantive offenses charged against the defendants in connection with the Count 1 conspiracy. Each of these substantive offenses allegedly involved travel in interstate commerce, use of interstate facilities and the transmission or attempted transmission of the sums of money referred to in the conspiracy allegation from Colonial, through various other hands, to the defendant Jacks. The substantive offenses alleged are charged as being violative of 18 U.S.C. §§ 1952 and 2.

Count 6 of the Indictment charges that between January 1, 1964 and De-

cember 31, 1964, the defendants Zirpolo, Jacks, Colonial, Giles, Bechtel Corp., Gates Const. Corp., Gates Equip. Corp. and Harry F. Waste, Robert L. Bowman, William L. J. Fallow and Robert S. Gates (unindicted co-conspirators) knowingly, wilfully and unlawfully combined and conspired with each other, and with others unknown to the Grand Jury, to commit certain offenses in violation of 18 U.S.C. § 1952 by traveling and causing others to travel in interstate commerce, and by using and causing others to use interstate facilities, with the intent to promote the unlawful activity of obtaining easements by bribery of officials of Woodbridge Township in violation of N.J.S. 2A:93–6, N.J.S.A.

The Indictment further alleges that, as parts of this conspiracy, Colonial, acting through its employee, Fred Stewart, would solicit advice and assistance from Zirpolo in arranging for the proposed purchase of easements through Woodbridge by Colonial on land owned by the Township; that Zirpolo would agree to meet with Stewart at Zirpolo's office at the Menlo Park Shopping Center, Edison, New Jersey but that instead, Zirpolo would arrange for Stewart to meet with Jacks at the above-mentioned location. At that meeting, Jacks, on behalf of himself, Zirpolo and unknown others, would solicit $100,000 from Colonial as a condition for obtaining the sale of easements through property of Woodbridge Township.

As an additional part of the conspiracy, it is alleged that Giles, Feldman and Leuty, acting for Colonial, would confer and agree to transmit $60,000 from Colonial to Zirpolo and Jacks to obtain their assistance in securing the sale of the easements.

It is further alleged that in furtherance of the Count 6 conspiracy, the defendants and unindicted co-conspirators named in that Count would agree to travel and to cause others to travel in interstate commerce and to use and to cause the use of interstate facilities for the purpose of arranging for the payment of $60,000 by Colonial to Zirpolo and Jacks in Edison, New Jersey; that in furtherance of same, arrangements would be made for a transfer of $20,000 in cash from Bechtel Corp.'s New York office to its New Jersey headquarters, and thence to Zirpolo and Jacks.

It is further alleged that arrangements would be made to utilize interstate commerce and facilities to effect the transfer, by means of false and fraudulent invoices, of $84,800, in two equal installments, from Colonial through Bechtel Corp., Gates Const. Corp. and Gates Equip. Corp., for the purpose of transmitting $40,000 in two equal payments to Zirpolo and Jacks.

Finally, it is alleged that the defendants would make, and cause to be made, false and fictitious documents and would perform other acts to hide the purpose of, and acts done in furtherance of the conspiracy, all in violation of 18 U.S.C. § 371.

The Indictment then reveals a series of twenty-three Overt Acts between February 12, 1964 and December 18, 1964 allegedly committed in furtherance of the alleged conspiracy.

Counts 7, 8 and 9 recite the substantive offenses allegedly committed in connection with the Count 6 conspiracy. These Counts allege three separate instances of transferring the amounts referred to in the conspiracy Count from California to New Jersey in violation of 18 U.S.C. §§ 1952 and 2.

The offenses charged in this Indictment center around 18 U.S.C. § 1952 which provides that:

"(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—* * *;

* * * * * *

(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,

and thereafter performs or attempts to perform any of the acts specified * * * shall be * * * [guilty of a violation of 18 U.S.C. 1952].

(b) As used in this section 'unlawful activity' means * * *, or (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States."

At all times relevant to the allegations of the Indictment in this case N.J.S. 2A:93–6, N.J.S.A. provided as follows:

"2A:93–6. Giving or accepting bribes in connection with government work, service, etc.

Any person who directly or indirectly gives or receives, offers to give or receive, or promises to give or receive any money, real estate, service or thing of value as a bribe, present or reward to obtain, secure or procure any work, service, license, permission, approval or disapproval, or any other act or thing connected with or appertaining to any office or department of the government of the state or of any county, municipality or other political subdivision thereof, or of any public authority, is guilty of a misdemeanor."

## CLAIMS OF GILES, FELDMAN AND LEUTY TO STATUTORY IMMUNITY

The defendants Giles, Feldman and Leuty have moved to dismiss the Indictment upon two grounds: (1) each of these defendants is immune from prosecution by virtue of the immunity provisions of § 601 of the Landrum-Griffin Act, 29 U.S.C. § 521; and (2) each of said defendants is immune from prosecution by virtue of the immunity provisions of the Interstate Commerce Act, 49 U.S.C. § 46.

The alleged immunity under the Landrum-Griffin Act is predicated upon the assertion that these defendants have given testimony with regard to transactions, matters and things covered by the Indictment, in obedience to a subpoena in a labor investigation conducted by the Secretary of Labor and officers designated by him, which comprehended possible violations of the Landrum-Griffin Act. That assertion is not in accordance with fact, and the situation disclosed in United States v. Weber, 255 F.Supp. 40 (D.N.J.1965) aff'd sub nom. United States v. Fisher, 384 U.S. 212, 86 S.Ct. 1453, 16 L.Ed.2d 479 (1966) is not only not identical with that in the case at bar but is clearly distinguishable therefrom. The difference between the cases is to be found at page 45 of the District Court's Opinion in the statement that:

"The Court does not mean to say that the United States Attorney had no right to subpoena Fisher or to conduct an investigation outside of the search for L.M.R.D.A. violations. If the subject matter of Fisher's testimony was anti-fraud then immunity would not necessarily attach unless it was a direct outgrowth of the testimony. See Heike v. United States, 227 U.S. 131, 33 S.Ct. 226, 57 L.Ed. 450 (1913) * * * and *Monia* * * * [United States v. Monia, 317 U.S. 424, 63 S.Ct. 409, 87 L.Ed. 376 (1943)]."

Section 601 of the Landrum-Griffin Act, 29 U.S.C. § 521, empowers the Secretary of Labor to conduct an investigation whenever he believes it necessary to determine whether any person has violated or is about to violate certain provisions of the Act. Subsection (b) of 29 U.S.C. § 521 makes 15 U.S.C. §§ 49 and 50 the controlling statutory sections to be applied in producing information and testimony during the course of such an investigation. 15 U.S.C. § 49 provides, in pertinent part, that:

"No person shall be excused from attending and testifying or from producing documentary evidence before the [Federal Trade Commission] * *

or in obedience to the subpoena of the commission on the ground or for the reason that the testimony or evidence, documentary or otherwise, required of him may tend to criminate him or subject him to a penalty or forfeiture. But no natural person shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter, or thing concerning which he may testify, or produce evidence, documentary or otherwise, before the commission in obedience to a subpoena issued by it: * * *."

The Grand Jury investigation which resulted in the Indictment in the case at bar involved no violations of the Landrum-Griffin Act over which the Secretary of Labor had any jurisdiction. On the contrary, that investigation related to alleged violations of 18 U.S.C. § 1952, 18 U.S.C. § 1951 and 29 U.S.C. § 186. The immunity provided by 29 U.S.C. § 521(b) and 15 U.S.C. § 49 can arise in favor of a person who has testified or produced evidence, documentary or otherwise, in obedience to a subpoena issued by or on behalf of the Secretary of Labor. Neither the Secretary of Labor nor any of his designees ever issued a subpoena either ad testificandum or duces tecum to any of the defendants in the case at bar who is presently moving for a dismissal of the Indictment.

There never was any grand jury labor investigation within the purview of the Landrum-Griffin Act. In 1961 it was discovered that there had been a wholesale embezzlement of labor union funds in the pipeline construction industry. As interstate pipeline construction crossed state lines, the same labor force was usually retained by the contractor throughout the work. This would frequently involve the intrusion of members of labor union locals into the territorial jurisdiction of members of other locals. This would require that the foreign local member would be required to pay "dobie" fees to the local having jurisdiction over the territory in which the foreign local member worked. Representatives of the Secretary of Labor discovered that some of these "dobie" payments were not being turned in to the Treasury of the local into whose territory the payor had intruded, but were being embezzled by the agent of the local union who had collected the "dobie". Because no records were kept of the receipt of the "dobie" payments by the collectors, it was difficult, if not impossible, to discover the embezzlements. Therefore, the investigators of the Labor Department endeavored to ascertain from the files of the employers the names of the out-of-state men who had worked on a given project within the state, and then to ascertain from· the records of the union having territorial jurisdiction over the work whether the "dobie" payments had been turned in to that local. The Labor Department instituted an investigation upon a nationwide basis which was commenced on August 28, 1964 and involved three successive steps: (1) ascertainment of the names of the contractors who had constructed the largest and the latest interstate pipelines; (2) ascertainment from the contractors' records how much "dobie" had been checked off and (3) examination of the records of each union to determine whether the "dobie" payments had in fact been received by the intended local.

This investigation revealed that Colonial was constructing an interstate pipeline from Houston, Texas to Linden, New Jersey, and that one of its subcontractors was Bechtel Corp. of San Francisco, California. The investigators were informed that Osage Construction Company of Tulsa, Oklahoma had been involved contractually in the construction of the pipeline as a subcontractor with Colonial, but that Colonial had been forced by a labor leader to rescind the contract with Osage and to let it to another subcontractor at a higher price. For the purpose of verifying this information, the investigators contacted Giles and Feldman, officers of Colonial, in the presence of an attorney for that corporation. The interview yielded verification of the information which the inves-

tigator had obtained and also revealed that the Osage contract had been awarded to another corporation believed to be in league with the labor leader. Upon the suggestion of Feldman, the investigators consulted a private detective, who had been employed by Colonial in New Jersey, from whom further confirmation of the statements of Giles and Feldman was obtained. The foregoing information was disclosed to the Deputy Chief of the Organized Crime and Racketeering Section of the Department of Justice, who advised the investigators that the information disclosed a possible violation of the Hobbs Act, 18 U.S.C. § 1951. The matter was then turned over to the Federal Bureau of Investigation, and the Department of Labor conducted no further investigation in the premise. Inquiry of Bechtel Corp. in San Francisco had revealed that certain members of the New Jersey Operating Engineers were being paid for 21 hours a day, six days a week, and that the recipients of this pay appeared to be union agents, several of whom had grossed more than $50,000 in less than 12 months of actual work.

After the investigation by the Secretary of Labor had been relinquished and turned over to the Federal Bureau of Investigation, the office of the Attorney General by Fred M. Vinson, Jr., Assistant Attorney General in charge of the Criminal Division of the Department of Justice, on the basis of the completed F. B.I. investigation, authorized a general Grand Jury investigation into the construction of the Colonial Pipeline within New Jersey, and the Deputy Attorney General appointed Messrs. White, Stern and Goldstein, special attorneys to conduct such a Grand Jury investigation with the object of ascertaining whether there had been violations of the Hobbs Act or the Taft-Hartley Act or both. Because of the information which had already been obtained by one of the Labor Department investigators, the Department of Justice requested the loan of that investigator, in the interest of

economy, to the special attorneys conducting the Grand Jury investigation.

The fruits of the Grand Jury investigation, conducted by the special attorneys, resulted in Indictments for extortion and attempts to extort money in violation of the Hobbs and Taft-Hartley Acts. In addition to these Indictments, the Grand Jury returned the Indictment in the case at bar charging the defendants herein with conspiracy to violate and substantive violations of 18 U.S.C. § 1952. No violation of any labor statute which the Secretary of Labor has the authority to investigate under 29 U.S.C. § 521 was charged in that Indictment.

The special attorneys of the Department of Justice designated by the Deputy Attorney General caused a special Grand Jury to be impanelled on February 14, 1966 for the purpose of investigating the possibilities of extortion in the conduct of the labor leader hereinabove referred to in allegedly forcing Colonial to rescind its contract with Osage; forcing another company to pay him a substantial amount in cash in connection with the payments to union agents for fictitious services by the threat of labor unrest; and in connection with pressure allegedly put on Bechtel Corp. to award a subcontract to the Joyce Pipeline Company. Four separate Indictments were returned by this Grand Jury charging the labor leader and others with numerous Hobbs' Act violations; but no indictment was ever returned concerning any matter which lay within the investigative jurisdiction of the Secretary of Labor, under 29 U. S.C. § 521, which he could delegate pursuant to a memorandum of understanding with any other executive department or otherwise.

The defendant, Giles appeared before the Grand Jury on March 31, 1966 in response to a subpoena duces tecum directed to him as an officer and representative of Colonial to produce corporate documents. He stated that he understood that his appearance was only for the purpose of producing books and records called for in the subpoena; that

he was not required to give any testimony respecting any matter whatsoever; and that if he volunteered anything, either before the grand jury or in conversation with anyone connected with the Government, either inside or without the grand jury room, he would be doing so as a matter of his own free choice and not in response to any subpoena. He was warned that he was under no obligation to speak to any Governmental employee either within or without the grand jury room but that if he did so, whatever he might say might be taken down and used in evidence. He stated that he recognized that he had the right to counsel, and admitted that he was accompanied to the door of the grand jury room by his attorney who awaited him outside the room. The following day, April 1, 1966, Giles again voluntarily appeared before the Grand Jury and, on the advice of counsel, executed a waiver of immunity. He was then again reminded of his rights and warned and reported that he had consulted with his counsel. On this occasion Giles was asked no questions concerning the subject matter of the Indictment in this case.

During the month of May, F.B.I. accounting agents, in the course of examination of records of Bechtel Corp. for the Department of Justice, found a cancelled check in the amount of $20,000 which Bechtel Corp. had negotiated for cash. On May 24, 1966 one of the Bechtel Corp. bookkeepers informed the special attorneys for the Department of Justice that the check had been drawn by one Basil Licklider. On May 31, 1966, before Licklider was due to appear before the Grand Jury, his attorneys informed the special attorneys of the Department of Justice that Bechtel Corp. had given $60,000 in cash to the Mayor and Council President of the Township of Woodbridge, New Jersey on behalf of Colonial to enable Colonial to obtain certain permits and easements from the Township. This was the first information which the Government had received relating to the offenses charged in the Indictment in this case.

Between May 31, 1966 and June 5, 1966 the attorneys for Bechtel Corp. conferred with the attorneys for Colonial respecting the revelations which Bechtel Corp. had made to the Department of Justice; but on June 6, 1966 the attorneys for Bechtel Corp. informed the Department of Justice that Colonial refused to cooperate and would not come forth voluntarily to disclose its connection with the subject thereof.

On June 8, 1966 Giles appeared before the Grand Jury with certain books and records of Colonial, and revoked his previously executed waiver of immunity. He accordingly was released from the grand jury room without interrogation. As of this time the Government had no knowledge that Colonial had made a payment of $50,000 to Jacks and Zirpolo prior to the $60,000 payment which Bechtel Corp. had disclosed. On June 15, 1966 the attorney for Colonial advised the special Government attorneys that Colonial would not cooperate concerning the Bechtel Corp. disclosure of the $60,000 cash payment to Woodbridge officials which was then under investigation by the Grand Jury. On June 17, 1966 the Government attorneys caused a subpoena duces tecum to be served upon Giles for the production on June 23, 1966 of certain records of Colonial including any records which reflected the payment of any money directly or indirectly by Colonial to officials of the Township of Woodbridge.

It is alleged that on June 22, 1966 David T. Wilentz, Esq., an attorney representing Colonial and its employees, met with two of the special Government attorneys and revealed to them that Colonial had paid a total of $110,000 to Woodbridge officials for Colonial's acquisition of certain building permits and that the first $50,000 thereof had been paid by Colonial through another contractor, Rowland Tompkins Corporation. Mr. Wilentz stated that he understood that none of these monies had been paid as a bribe, but that the entire $110,000 had been extorted by corrupt public officials from Colonial which, as a mere victim, had committed no crime itself. Mr.

Wilentz informed the Government attorneys that it was Colonial's desire, and that of its employees, to appear before the Grand Jury in order to document their claim of extortion. He therefore requested an adjournment of the return day of the subpoena duces tecum which had been served upon Giles until Mr. Wilentz had completed his own investigation and could present the entire matter to the Department of Justice in an organized and intelligent manner. Accordingly, the Government attorneys agreed with Mr. Wilentz to postpone Giles' appearance under the subpoena.

On June 28, 1966 Mr. Wilentz informed special attorney Stern by telephone that his investigation was complete and that Giles and one Fred Stewart would appear to testify on June 29, 1966. Mr. Wilentz requested that a grand jury subpoena be issued to Stewart. On the latter date Giles and Stewart appeared at the local office of the attorneys for the Department of Justice with two members of the law firm of Mr. Wilentz. They then informed the special attorneys that Stewart had received the first solicitation for $50,000 which had culminated in the first series of payoffs, and some months later a second solicitation for $100,000 which had culminated in the second series of payments of $60,000 which had been initially revealed by Bechtel Corp. The Government attorneys were further informed by Colonial's counsel on this occasion that Stewart would prove that $110,000 had been extorted from Colonial as a victim, which had paid it out of fear and necessity and not as the culpable donor of a bribe. Prior to this occasion Stewart was unknown to the Government. Over the next two days Stewart and Giles, with their attorneys, spoke to the Government attorneys and attempted to convince them that they and Colonial had been the innocent victims of an extortion which had been applied by venal public officials. It was agreed, moreover, between counsel that Stewart and Giles would testify before the Grand Jury on July 1, 1966; but

Stewart's counsel requested that he be served with a grand jury subpoena. This was accomplished on June 29, 1966. Giles' appearance was only pursuant to the subpoena duces tecum which had previously been served upon him, and the return date of which had been previously adjourned. Stewart was served with a grand jury subpoena at the request of his counsel. The subpoena which was served on Giles was neither the subpoena of the Secretary of Labor nor was it issued pursuant to 29 U.S.C. § 521. He not only testified voluntarily with ample warning and understanding of his rights but no promise of immunity was given to him by the Government attorneys.

Neither Giles nor Leuty nor Feldman was ever compelled by subpoena or other means to give any testimony in a proceeding arising out of an investigation under the Interstate Commerce Act. Therefore, neither under 29 U.S.C. § 521, nor under 49 U.S.C. §§ 46, 47 or 48 did any immunity arise in behalf of Giles, Leuty or Feldman. Neither the Government special attorneys nor the Grand Jurors acted as agents of the Secretary of Labor in interrogating Giles, Leuty or Feldman. Those three defendants testified in support of their complaint in behalf of Colonial that their company had been the victim of extortion. They did not testify regarding any matter which 29 U.S.C. § 521 authorizes the Secretary of Labor to investigate by subpoena or to delegate others to investigate. Giles testified on July 1, 1966 as a volunteer and not under the compulsion of any subpoena. Leuty and Feldman testified on July 13, 1966 on their own initiative and for their own purposes, and after the subpoenas which had been issued for them had been vacated. None of these defendants testified respecting any transaction, matter or thing concerning which he had testified or produced evidence, documentary or otherwise, in any proceeding under Chapter 1 of Title 49 of the United States Code or any law amendatory thereof or supplemental thereto. Sec-

tion 48 of the same Title expressly provides that the immunity provisions in Sections 43, 46 and 47 thereof shall extend only to natural persons who in obedience to a subpoena give testimony or produce evidence under oath. In order to permit immunity to arise in behalf of any of the defendants under the Interstate Commerce Act there must be a cause or proceeding based upon or growing out of a violation of the Act, and the witness must have been required to testify in obedience to a subpoena. The special Grand Jury which returned the Indictment in this case was not engaged in a proceeding upon or growing out of an investigation under the Interstate Commerce Act. No immunity could arise under the cited sections of the Act unless the testimony given before the Grand Jury touched in some substantial and not remote way, on the subject matter of the Interstate Commerce Act which provided the immunity. Heike v. United States, supra. See also Himmelfarb v. United States, 175 F.2d 924 (9 Cir.) cert. den. 338 U.S. 860, 70 S.Ct. 103, 94 L.Ed. 527 (1949); United States v. Wilmington Chemical Corporation, 254 F.Supp. 92 (N.D.Ill.1966). This motion is denied.

## MOTION BASED UPON COMPELLED APPEARANCE BEFORE THE GRAND JURY

■ The defendants Zirpolo, Jacks, Feldman and Leuty contend that the Indictment should be dismissed as to them because they were compelled by subpoena to appear before the Grand Jury when the Government intended, upon the basis of information in its possession, to make them defendants to the Indictment sought. Their respective motions grounded upon the foregoing contentions are denied. The defendants, Zirpolo and Jacks, who were represented by counsel, refused to give any testimony before the Grand Jury when they appeared before that body. Each of them refused to sign a waiver of immunity, was fully apprised of his rights, refused to testify and was excused from the jury room. No attempt was made to coerce either of these defendants into waiver of his Fifth Amendment rights, nor was either Zirpolo or Jacks threatened with removal from his respective municipal office. The investigation in which the Grand Jury was engaged to which these defendants were subpoenaed was a "John Doe" investigation. Having been warned of their constitutional rights not to testify, the Government's intention to prosecute these defendants does not render their appearance before the Grand Jury efficacious to impair the validity of the Indictment against them. United States v. Winter, 348 F.2d 204 (2 Cir.) cert. den. 382 U.S. 955, 86 S.Ct. 429, 15 L.Ed.2d 360 (1965).

The additional fact that the particular Government attorneys assisting the Grand Jury had been informed that the defendants Zirpolo and Jacks did not wish to appear before the Grand Jury and, if forced to do so, would invoke their Fifth Amendment privilege does not call for a different result upon this application. See United States v. Leighton, 265 F.Supp. 27, 36 (S.D.N.Y.1967) and United States v. Pilnick, 267 F. Supp. 791, 798 (S.D.N.Y.1967).

■ Although compelled to appear before the Grand Jury by subpoena, neither Jacks nor Zirpolo was compelled to *testify*. Leuty and Feldman *appeared* and *testified* before the Grand Jury on advice of counsel, voluntarily and with full warning of their constitutional rights. The motions of these defendants to dismiss the Indictment because they appeared before the Grand Jury are denied.

## MOTIONS TO DISMISS UNDER RULE 12(b), F.R.CR.P.

In addition to the several motions for dismissal under F.R.Cr.P. 12(b) which are treated separately in this Opinion, all of the defendants seek dismissal of the Indictment under Rule 12(b) of the Federal Rules of Criminal Procedure on one or more of the following grounds:

(1) 18 U.S.C. § 1952 was not intended to apply to the type of activity charged in this Indictment.

**1008**

(2) The conduct charged in this Indictment does not fall within the boundaries of federal criminal jurisdiction and prosecution, by virtue of the Tenth Amendment, is reserved to the State of New Jersey.

(3) Counts 1 and 6 (Conspiracy Counts) are fatally defective since they charge a conspiracy to commit a joint offense, namely, bribery.

(4) The activity charged does not constitute a violation of N.J.S. 2A:93–6; moreover, the allegations of the Indictment do not adequately charge a violation of that statute.

(5) Paragraphs 1 through 16 of that Indictment are not incorporated in any Count thereof, and the failure to do so renders the various Counts insufficient.

(6) Counts 1 and 6 of the Indictment are duplicitous in that they allege, respectively, two and three separate conspiracies rather than a single conspiracy per Count.

(7) Counts 2 through 5 are also inadequate in that each alleges multiple offenses.

(8) Counts 2 through 5 and 7 through 9 are insufficient in light of 18 U.S.C. §§ 2 and 1952 since they fail to allege that the persons who traveled in interstate commerce did so with the intent to promote an unlawful activity, and further the Counts fail to allege that the persons who so traveled thereafter performed acts in furtherance of the unlawful activity alleged.

(9) The Indictment is defective since it fails to allege that Jacks had knowledge of either the interstate character of the activities alleged or the use of interstate facilities.

(10) The Indictment fails to allege a specific "mens rea" to commit bribery.

(11) Count 6 of the Indictment was amended and, no showing having been made that the Grand Jury voted on same, the Indictment must be dismissed.

■■ This Opinion has already comprehensively reviewed the charges in the indictment in this case. The movants contend that the type of alleged bribery set out therein was never intended by Congress to be embraced by the terms of 18 U.S.C. § 1952. Defendants urge that both the title of the statute, "Interstate and foreign travel or transportation in aid of racketeering enterprises" and its legislative history, indicate that the statute was intended to proscribe only that unlawful use of interstate channels which furthered illegal racketeering business operations, and was not intended to reach allegedly unlawful utilization of interstate commerce and facilities which was in furtherance of legitimate business activities. It is true, no doubt, that the main purpose in enacting Section 1952 was to attempt to curb the pollution of interstate commerce by elements of organized crime. However, neither the title of this Section nor its legislative history can be relied upon to limit the coverage of the explicit language of its text. Subdivision (3) of subsection (a) of Section 1952 prohibits the promotion, management, establishment, and carrying on of any unlawful activity or the facilitating of same. In defining "unlawful activity" subdivision (2) of subsection (b) of that Section includes extortion, bribery or arson in violation of State law. This language is an alternative definition, clearly framed in the disjunctive, from the initial half of that set out in subdivision (1) of that same subsection which is limited to "* * * business enterprise[s] involving gambling, liquor * * *, narcotics, or prostitution * * *." (Emphasis supplied.) Activity similar to that charged in this Indictment, or perhaps more accurately, equally disparate from that type of activity to which, defendants assert, Congress intended to limit the application of the statute, has been held, nevertheless, to constitute a violation thereof. See United States v. Kubacki,

237 F.Supp. 638 (E.D.Pa.1965); United States v. Parzow, 391 F.2d 240 (4 Cir. 1968) and United States v. Wechsler, 392 F.2d 344 (4 Cir. 1968). Furthermore, defendants can take little comfort from the case of Marshall v. United States, 355 F.2d 999 (9 Cir. 1966) upon which they apparently seek to place reliance. In that case the defendants were convicted, under 18 U.S.C. § 1952, for traveling in interstate commerce to carry on the illegal activity of extortion. That Court held that a single act of extortion was sufficient to support conviction and that no "business enterprise" need be shown in connection with the extortionate activity. In referring to the legislative history of this statute a reference, which it thought unnecessary in view of the plain language thereof, the Court in *Marshall*, supra, nevertheless stated that:

> "* * * [A] fair reading of the legislative history indicates that its proponents believed the main target (but not the sole target) of the legislation, was interstate traveling to promote gambling. * * *. Lesser targets were the 'businesses' of traffic in liquor, narcotics and prostitution. Subdivision (2) of the § 1952(b) had a more specific target (even though perhaps a less important target): extortion, as defined by state laws. It was a single act of extortion (not necessarily a continued course of extortion) which had been accomplished or facilitated by interstate travel that the second subsection of § 1952(b) sought to prevent and punish." Marshall v. United States, supra, at 1002.

Therefore, in view of the reasons indicated above, the motion to dismiss the Indictment, on the ground that the activity alleged is not reached by the statute relied upon, must be denied.

 Equally unavailing to defendants is their assertion that, if 18 U.S. C. § 1952 is found to encompass the alleged activity charged in this Indictment, the case must be dismissed since the attempted exercise of such power is in excess to that delegated to Congress under the Commerce Clause of the Constitution. Additionally, movants assert that the control over the alleged activities recited in this Indictment is reserved to the State of New Jersey pursuant to the Tenth Amendment. A similar attack upon this statute was made and denied, and the constitutionality of Section 1952 upheld, in this Circuit in United States v. Barrow, 363 F.2d 62 (3 Cir. 1966) cert. den. 385 U.S. 1001, 87 S.Ct. 703, 17 L.Ed.2d 541 (1967). Other Circuits, faced with an identical proposition, have upheld Section 1952 as a valid exercise of the plenary power of Congress to ensure the integrity of interstate commerce. See United States v. Zizzo, 338 F.2d 577 (7 Cir. 1964) cert. den. 381 U.S. 915, 85 S.Ct. 1530, 14 L. Ed.2d 435 (1965); Turf Center, Inc. v. United States, 325 F.2d 793 (9 Cir. 1963) and Bass v. United States, 324 F. 2d 168 (8 Cir. 1963). Additionally as the Court, in the *Marshall* case, supra, 355 F.2d at p. 1004, in distinguishing Linder v. United States, 268 U.S. 5, 45 S.Ct. 446, 69 L.Ed. 819 (1925), relied upon by the defendants both there and here, stated:

> "Nor do we believe that § 1952 constitutes an attempt to enforce state criminal laws, and therefore is violative of the Tenth Amendment: 'It is no objection to the assertion of the power to regulate interstate commerce that its exercise is attended by the same incidents which attend the exercise of the police powers of the states.' "

The Tenth Amendment, of course, does not diminish the power of Congress to regulate commerce between the states. United States v. Barrow, supra, 363 F. 2d at 65. Finally, the argument that usurpation of power is evidenced by escalation of a state misdemeanor to a federal felony is plainly without merit. See United States v. Brennan, 394 F.2d 151, 153 (2 Cir. 1968).

 Therefore defendants' motion to dismiss based upon their assertion that 18 U.S.C. § 1952, as applied to these

facts, is an invalid exercise of Congressional power is likewise denied.

■ The movants, with equal vigor have sought to demonstrate that there cannot be a conspiracy to commit a joint offense. In other words, say the defendants, one cannot be accused of agreeing to commit a crime and also of committing that crime where the agreement is an integral part of the substantive crime. Therefore, they assert, Counts 1 and 6 must fall since it is impossible for the crime of bribery to exist absent agreement between the giver and the receiver of the bribe to effect the transaction. However, the conspiracy charges in this Indictment are based upon violations of 18 U.S.C. § 1952 and not upon a simple agreement to commit bribery. That being so, there is more to the crime than the mere act of bribery and the conspiracy to violate the New Jersey statute against bribery by use of interstate commerce and facilities is well pleaded. See United States v. Parzow, supra, 391 F.2d at 241 and United States v. Corallo, 281 F.Supp. 24, 28 (S. D.N.Y.1968).

■ Defendants contend that the allegations set out in the Indictment do not constitute the type of activity which N.J.S. 2A:93–6, N.J.S.A., was intended to proscribe. Even if the activities are held to fall within the terms of the statute, movants assert that the facts alleged are insufficient to charge a violation of the statute invoked. Defendants' argument is rejected on both grounds. The statute in question N.J.S. 2A:93–6, N.J.S.A., declares that:

> "Any person who directly or indirectly gives or receives, * * * any money, * * * as a bribe, * * * to obtain, * * * any * * * license, permission, approval or disapproval, or any other act or thing connected with or appertaining to any office or department of the government of * * * any * * * municipality * * * is guilty of a misdemeanor."

In construing the statute, the New Jersey Supreme Court in State v. Begyn, 34 N.J. 35, 47, 167 A.2d 161 (1961), declared that:

> "The crime [of bribery] is committed by the mere offer as well as by the actual payment; in the latter event it is of no moment that the original solicitation may have been by the officer rather than the briber. It is not necessary that the act requested be one which the official has authority to do. Sufficient it is if he has official power, ability or apparent ability to bring about or contribute to the desired end. * * * Both the offeror and the recipient are guilty of the offense and it makes no difference whether the official action bargained for thereafter actually takes place."

The alleged activity set out in this Indictment appears to be encompassed by the definitive language used by the New Jersey Supreme Court in the *Begyn* case, supra. Furthermore, the state crime is said to serve only as a background identification of the unlawful activity. United States v. Wechsler, supra; United States v. Kubacki, supra; McIntosh v. United States, 385 F.2d 274 (8 Cir. 1967). The fact that the New Jersey statute which gave birth to N.J. S. 2A:93–6, N.J.S.A., was more narrow in scope than its current successor does not preclude prosecution under this statute. The Indictment alleges solicitation by one or the other of the parties and the offer of assistance involving government activity, concerning which at least apparent authority existed. Under the law that is sufficient. The motion is therefore denied.

■ Defendants attack the Indictment for alleged formal insufficiency in that Paragraphs 1 through 16 are not incorporated into any Count of the Indictment. The absence of such incorporation, movants assert, renders each Count insufficient. The first three pages of the Indictment (paragraphs 1 through 16) describe the status and official position of the respective defen-

dants, but those paragraphs are not expressly "incorporated by reference" in any "Count". Movants conclude, therefore, that each "Count" is fatally deficient. The conclusion is unwarranted. The allegations of paragraphs 1 through 16 are not essential to charges of violations of 18 U.S.C. §§ 1952 and 371. Turf Center, Inc. v. United States, supra citing United States v. Debrow, 346 U.S. 374, 74 S.Ct. 113, 98 L.Ed. 92 (1953) and Hagner v. United States, 285 U.S. 427, 52 S.Ct. 417, 76 L.Ed. 861 (1932). It is the *charging part* of an indictment which the court may not amend. Ex parte Bain, 121 U.S. 1, 7 S. Ct. 781, 30 L.Ed. 849 (1886); Stirone v. United States, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960); Russell v. United States, 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962); United States v. Consolidated Laundries Corporation, 291 F.2d 563 (2 Cir. 1961). Paragraphs 1 through 16 of the Indictment embody background descriptive allegations identifying the defendants but containing no charges against any of them. They could be deleted without impairing the efficacy of the Indictment. They are not essential to the charges contained in the respective Counts of the Indictment and need not be expressly incorporated by reference therein. Defendants may move to delete them under F.R.Cr.P. 7(d). See United States v. Vazquez, 319 F.2d 381 (3 Cir. 1963). The Indictment complies with F.R.Cr.P. 7(c) because it is "a plain, concise and definite written statement of the essential facts constituting the offense[s] charged. * * *. It need not contain a formal commencement, a formal conclusion or any other matter not necessary to such statement."

Defendants' motion to dismiss the conspiracy Counts (1 and 6) and certain substantive Counts (2, 3, 4 and 5) for duplicity must be denied.

As we have pointed out *ante*, Counts 1 and 6 of the Indictment each charge a single conspiracy in that in each of the Counts the defendants allegedly conspired together in violation of 18 U.S.C. § 371 to violate 18 U.S.C. § 1952 by traveling and causing others to travel in interstate commerce and by using and causing others to use interstate facilities with the intent of promoting an unlawful activity; namely, obtaining building permits (Count 1) and purchasing easements (Count 6) by means of bribing certain officials of Woodbridge Township. All the other material in each of these Counts is explanatory of the means and methods utilized to achieve the objective of the conspiracy.

■ An allegation in a single count of conspiracy to commit several crimes is not duplicitous, since the conspiracy is the crime, and that is single however diverse may be its objects. Braverman v. United States, 317 U.S. 49, 63 S.Ct. 99, 87 L.Ed.2d 23 (1942); United States v. McKenney, 181 F.Supp. 143 (S.D.N.Y. 1959) affd. 281 F.2d 908 (2 Cir. 1960) cert. den. 366 U.S. 960, 81 S.Ct. 1916, 6 L.Ed.2d 1253 (1961); United States v. Knox Coal Co., 347 F.2d 33 (3 Cir.) cert. den. 382 U.S. 904, 86 S.Ct. 239, 15 L. Ed.2d 157 (1965); Overstreet v. United States, 321 F.2d 459 (5 Cir. 1963) cert. den. 376 U.S. 919, 84 S.Ct. 675, 11 L. Ed.2d 614 (1964).

■ The substantive offenses constituting the collective object of the conspiracy are alleged to have consisted of travel in interstate commerce and use of interstate facilities in furtherance of the conspiracy. Thus the Indictment charges a single conspiracy to travel in and employ the facilities of interstate commerce to achieve the bribery proscribed by N.J.S. 2A:93-6, N.J.S.A. Therefore the Indictment meets the criteria of United States v. Jackson, 344 F.2d 158 (3 Cir. 1965) in that it advises the defendants of the nature and cause of the accusations sufficiently to enable them to meet the accusations and prepare for trial, and affords a basis upon which, after judgment, they may be able to plead the record and judgment in bar of further prosecution for the same of-

## 1012

fenses. The part each of the conspirators played in working toward the achievement of the object of the conspiracy is adequately disclosed in the allegations of the Indictment. Carbo v. United States, 314 F.2d 718 (9 Cir. 1963). The sufficiency of an indictment is not determined by whether the indictment alone will protect the accused against the possibility of double jeopardy, since the judgment of conviction or acquittal is a bar to further prosecution, and the entire record of all proceedings against the accused may be referred to if there is a claim that a subsequent prosecution constitutes double jeopardy. Woodring v. United States, 376 F.2d 619 (10 Cir. 1967).

 Movants rely, *inter alia*, upon Bins v. United States, 331 F.2d 390 (5 Cir. 1964) in urging that Counts 2 through 5 are duplicitous in that in each Count the defendants are charged with causing the interstate travel of more than one individual in violation of 18 U. S.C. § 1952. Following the rationale in the *Bins* case, supra, movants urge that the alleged duplicity requires a dismissal of these Counts since it will be impossible to ascertain from a jury verdict whether each juror concurred in all the crimes alleged in each Count. However, the *Bins* case, supra, is clearly distinguishable from the facts at bar. In that case the defendant was charged in each Count with submitting, on two separate occasions, two entirely different allegedly false statements to the government. The possible prejudice arising from the inclusion of both documents is obvious. As with *Bins*, supra, United States v. Forys, 113 F.Supp. 580 (D.R.I.1953) and United States v. Martinez-Gonzales, 89 F.Supp. 62 (S.D.Cal.1950) are factually distinguishable from the case at bar. Whether the government could have charged the defendants with a separate violation for each person whom they allegedly caused to travel in interstate commerce in violation of 18 U.S.C. § 1952 on the same date, on the same

mission, and apparently in each others company is a question the Court need not decide. The analogy drawn by the Government to the construction given to the Mann Act, 18 U.S.C. § 2421, in this regard is a cogent one. See Bell v. United States, 349 U.S. 81, 75 S.Ct. 620, 99 L.Ed. 905 (1955) and Guffey v. United States, 310 F.2d 753 (10 Cir. 1962). The Government alleges that the defendant on dates certain violated 18 U.S.C. § 2 and § 1952 by allegedly causing certain interstate travel. The mere fact that the alleged effect of that causative impulse was the travel of more than one individual does not render the above-mentioned Counts duplicitous.

 Defendants, in a further attack upon the sufficiency of the Indictment, urge that Counts 2 through 5 and 7 through 9 are insufficient because they fail to allege essential elements of the offenses charged. Defendants contend that prosecution under these Counts will be based upon 18 U.S.C. § 2(b) in that the defendants are to be held liable for allegedly causing the doing of an act, which if performed by the one causing the act to be performed, would constitute an offense against the United States. In the present situation, movants contend, these Counts are insufficient since they fail to allege that the persons who traveled in interstate commerce did so with the intent to promote an illegal activity in violation of 18 U.S.C. § 1952 and further fail to allege that these same individuals, subsequent to their interstate travel, performed acts promoting the unlawful activity. Initially it should be noted that the Counts do allege certain subsequently performed acts which, if the proof of the Indictment be sustained, were clearly in furtherance of the unlawful activity. Criminal responsibility cannot be avoided under 18 U.S.C. § 2(b) simply on the basis that the particular agent, which the accused has selected to perform an act essential to the commission of the crime, was devoid of the criminal intent

required to render the agent himself culpable. Such is not the law and defendants' argument is faulty in its initial premise as a simple analysis of their argument will demonstrate. Assuming as we must for purposes of these motions, the truth of the allegations of the Indictment, an intent to violate 18 U.S.C. § 1952 is attributable to each of the defendants. That being so, under 18 U.S.C. § 2(b) the acts performed by certain individuals and attributable on a causal level to these defendants would, if performed by them, coincide with the requisite criminal intent and that interrelationship would yield a violation of 18 U. S.C. § 1952. The aider and abetter statute simply states that criminal responsibility cannot be avoided by an actor who substitutes another instrumentality to perform some element of the criminal activity even though that instrument selected lacks the "mens rea" to commit the offense charged. Defendants by twisted interpretation of the statute seek to endow the otherwise culpable principal with the absolving ignorance of his unwitting agent. However, the law is entirely to the contrary. See Pereira v. United States, 202 F.2d 830, 837 (5 Cir. 1953) aff'd 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954) and United States v. Leggett, 269 F.2d 35 (7 Cir. 1959). Therefore, the motions to dismiss Counts 2 through 5 and 7 through 9 for failure to allege an essential element of the offenses charged is denied.

 In view of the explicit language of the Indictment, the motions by the defendant Jacks to dismiss the Indictment for failure to allege a specific "mens rea" to commit bribery and for allegedly failing to charge knowledge of interstate activities and use of interstate facilities to violate 18 U.S.C. § 1952 are clearly without merit. These motions merely alter the phraseology of prior arguments, namely, the allegedly inadequate method of charging a violation of N.J.S. 2A:93–6, N.J.S.A., and the alleged inadequacies in Counts 2 through 5 and 7 through 9 regarding certain essential elements of the offense charged. Therefore, these motions are likewise denied.

 Defendants also contend that the Indictment must be dismissed because a handwritten amendment to Count 6 thereof, substituting the name of Bechtel Corp. for Rowland Tompkins Corporation, had not been shown to have been voted upon by the Grand Jury. The Indictment on file contains no indication of such an amendment. An affidavit filed on November 13, 1967 by Special Government Attorney Philip T. White, indicates that the Grand Jury, on February 23, 1967, considered a proposed indictment submitted by him to the body with an instruction that they could return it intact, alter or amend it in accordance with their best recollection, or refuse to return an indictment at all. Subsequently, after some deliberation the Grand Jury requested his presence and stated that, contrary to the wording of the proposed indictment, their best recollection of the facts presented was that Bechtel Corp. and not Rowland Tompkins Corporation should be charged as a defendant in the Count 6 conspiracy. Accordingly, White caused Count 6 to be physically amended and resubmitted the Indictment in its amended form to the Grand Jury. Some time later that body informed White through its spokesman that they had voted unanimously to return the Indictment as amended. Apparently the physical amendment to certain copies was done in pencil unlike the amendment to the original Indictment which was apparently effected by an erasure and retyping since the Indictment as returned and filed bears no evidence of alteration. Under these circumstances, the motion is entirely without merit and, therefore, is denied.

## GRAND JURY

 All of the defendants have moved for a dismissal of this Indictment

based upon alleged defects in the impanelling of the Grand Jury. They contend that the procedure through which, by predetermination, the total number of names placed into the jury wheel is weighted 2 to 1 in favor of men's names amounts to a systematic exclusion of and discrimination against women citing, *inter alia*, Ballard v. United States, 329 U.S. 187, 67 S.Ct. 261, 91 L.Ed. 181 (1946). Additionally, movants assert that further evidence, uncontroverted by the Government, indicates that contrary to the assumed purpose of the contested procedure, the result achieved was an even greater disproportion between the number of men and women on the Grand Jury panels. The Court has just recently had the occasion to decide this identical point in United States v. American Oil Co., 286 F.Supp. 742 (D.N.J. July 15, 1968). The Court can find no reason to decide this motion any differently than the one in *American Oil*, supra. As was said in that case:

> "There has been no showing of any exclusionary procedure directed at a cognizable class forming a component of a fair cross-section of the community. Both men and women are represented in substantial numbers on all jury lists, even if disproportionately. The courts have never held that a defendant is entitled to proportionate representation of cognizable groups on the list from which jury panels are selected. In fact, just the opposite is true. See Swain v. Alabama, supra at 308 and Dow v. Carnegie-Illinois Steel Corporation, 224 F. 2d 414 (3 Cir. 1955). In the final analysis ' * * * it is doubtful whether any system could be devised to accomplish this purpose.' United States v. Hoffa, 349 F.2d 20, 31 (6 Cir. 1965)."

Therefore, the motion to dismiss this Indictment for defects in the impanelling of the Grand Jury is denied.

## DISCLOSURE OF MATERIAL BEFORE AND VOTE OF GRAND JURY

Initially, certain of the defendants moved for a disclosure of the voting of the Grand Jury based upon their assertion that Rule 6, F.R.Cr.P. required that in returning a multi-count, multi-defendant indictment it was incumbent upon the prosecution to demonstrate that the requisite number of Grand Jurors voted in favor of indicting each defendant on each count in which he was charged. Defendants cited no authority that such a procedure is required by the Rule relied upon. In any event, an affidavit of Special Attorney Philip T. White was filed in this matter on November 13, 1967 in connection with a purported amendment to Count 6 of the Indictment. In substance that affidavit indicated that a proposed form of indictment was presented to the Grand Jury. That body indicated that as to one Count a party was named as a defendant which designation did not accord with the Grand Jury's recollection of the material presented before them. In accordance with their instructions an alteration was made. Subsequently the proposed amended indictment was again presented to the Grand Jury.

A further stipulation on this issue was submitted to this Court on March 14, 1968. In that stipulation Special Attorney White attests that no specific instruction was given to the Grand Jury as to the necessity of voting on each defendant named in each Count of the Indictment. The stipulation reveals that some time subsequent to the submission of the amended proposed indictment, the Grand Jury summoned the Special Attorneys in charge and informed them that the Grand Jury had unanimously voted to return the Indictment in its amended form. This Court is of the opinion that the procedure followed, as indicated by the above-mentioned averments, was in accord with the requirements of F.R.Cr.P. Rule 6. Therefore, on April 18, 1968 during the

course of oral argument, this motion was denied.

█ The defendants, suffering from no loss of ingenuity, subsequent to requesting disclosure of the Grand Jury vote, now attack the Indictment and seek its dismissal because, as they contend, the revelations of the Grand Jury to the Special Attorneys in charge and the disclosures, via affidavits by Special Attorney White in outlining the procedure utilized in connection with the return of this Indictment, violated the requirement of Grand Jury secrecy. The Court finds that the disclosures made in connection with these motions in no way violates the provisions of Rule 6, F.R. Cr.P., subdivision (e) of which merely precludes the revelation of the vote of any *particular* Grand Juror, a disclosure not made in this instance except to the extent that that body indicated that its action was adopted unanimously. Additionally, it ill behooves the defendants to castigate the Government for disclosing the identical information which it sought in regard to a motion to dismiss on the ground of a purported handwritten amendment to Count 6, which information could, according to Rule 6(e), be revealed with the Court's permission "at the request of the defendant upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury." Accordingly, this motion is likewise denied.

█ Defendants also move to invalidate the Indictment because of the revelation of certain documents subpoenaed by the Grand Jury to agents of the F.B.I. Rule 6(e) provides for disclosure of matters occurring before the Grand Jury to attorneys for the Government for use in the performance of their duties. This Court finds that the procedure utilized in connection with this case in no way violated the precepts of Rule 6(e). See United States v. United States District Court, 238 F.2d 713, 720 (4 Cir. 1956) cert. den. 352 U.S. 981, 77 S.Ct. 382, 1 L.Ed.2d 365 (1957).

As an alternative aspect of this same motion, certain of the defendants moved to suppress use of the documents disclosed to F.B.I. agents as evidence in the present litigation. Since this Court finds that the procedure utilized comported with rather than deviated from the requirement of Rule 6, F.R.Cr.P., this motion is likewise denied.

█ In conjunction with this motion, defendants Jacks and Zirpolo have requested that certain evidence procured by use of the subpoena powers of the Internal Revenue Service under 26 U.S.C. § 7602 should be suppressed. This motion apparently stems from an investigation into the tax liability of one Eastern Capital Corporation, a company in which the above-mentioned individuals apparently possess a financial interest. On April 13, 1967 a hearing was held upon the motion of Jacks and Zirpolo to quash the subpoena issued in connection with the above-mentioned investigation. Judge Coolahan of this Court found that the subpoena was served in furtherance of an independent Grand Jury investigation into alleged tax fraud. The Government on this application further represents that no evidence which was produced pursuant to the I.R.S. subpoena in question relates to the charges in this Indictment. Nothing in the record of the hearing held in connection with the present motions has been raised to controvert the finding originally made by Judge Coolahan. Therefore, the Court finds no reason to conduct a further evidentiary exploration along these lines and the motion to suppress, no illegal seizure having been established, is denied. Of course, if something to the contrary should arise upon trial which casts doubt upon the veracity of the representations made by the Government on this issue, appropriate avenues of relief will still be available to the movants. Additionally, defendants Jacks and Zir-

polo are not foreclosed from attacking the appropriateness of the procedure utilized within the context of a tax case, when and if one should be initiated against them.

## IMMUNITY OF BANKES AND TOMPKINS

The motions of Zirpolo and Jacks to suppress the Grand Jury testimony of two Government witnesses, Ralph A. Bankes and Howard Tompkins, upon the asserted ground that the Government obtained this testimony by means of an improper grant of immunity are denied for lack of merit. Such motions derive authority, if any, from F.R.Cr.P. 41(e), which permits them to be made only by "[a] person aggrieved by an unlawful search and seizure." Bankes and Tompkins appeared before the Grand Jury in obedience to subpoena; but, upon advice of counsel, they invoked their Fifth Amendment privileges and refused to testify. They were thereupon excused, but later were again placed before the Grand Jury which compelled them to testify, and advised them that by so doing they would be effectually immunized, pursuant to 47 U.S.C. § 409(l), "as to all the matters and transactions covered by their testimony." By this assurance they were induced to and did testify.

■ Neither Zirpolo nor Jacks has standing to question the Government's grant of immunity to Grand Jury witnesses Bankes and Tompkins, even if, as Zirpolo and Jacks contend, 47 U.S.C. § 409(l) was inapplicable to the offenses for which an indictment was being sought because the proceeding before the Grand Jury was not "based upon or growing out of" an alleged violation of the Federal Communications Act, and even if no Court order appears to have compelled the witnesses to testify.

■ The frivolous character of Zirpolo's attempt to justify his standing to question the propriety of the immuniza-tion of Bankes and Tompkins is obvious in the following language in his Memorandum in Support of Supplemental Motion for Suppression of Evidence (p. 6):

"But if the defendant has no standing to complain of this illegal conduct, who will?

Surely the witnesses Bankes and Tompkins have no reason to challenge the validity of the purported grant of immunity for their own alleged viola-tions * * *. No doubt they would welcome the protection of an immuni-ty grant. But they are not entitled to such protection when Congress has not authorized it."

That the Grand Jury testimony of Bankes and Tompkins may have been ad-verse to those movants would not entitle the latter to a suppression of that testi-mony.

## MONITORING

Included among the original motions brought by the defendants in regard to this Indictment is a motion to inquire into the possibility of electronic moni-toring during the course of the Govern-ment's investigation of this case. The motion was made subsequent to certain correspondence between attorneys for the defendants on the one hand and Gov-ernment attorneys on the other, the fruits of which proved unsatisfactory to defense counsel. In the course of this correspondence, a response was made by the Government according to the policy procedure dictated by the Department of Justice as outlined in Schipani v. United States, 385 U.S. 372, 87 S.Ct. 533, 17 L. Ed.2d 428 (1966). The meaning of that answer was equivocal and lent a certain amount of credence to movants' conten-tion that the replies of the Government contained a negative pregnant in that the affirmative substance of the re-sponse evoked belied its negative facade. In essence the answer given to defen-dants' questions was that inquiries made of the various agencies involved had

elicited a response that, either the defendants were not the subject of any electronic surveillance conducted by said agency or that the defendants were not identified as being present at or participating in any conversation with any person who was the subject of electronic surveillance carried out by said agency.

In connection with the companion motion brought by the Government to quash certain subpoenas served pursuant to the monitoring motion brought by defendants, Special Attorney White filed an affidavit dated February 7, 1968. That affidavit asserts that there has been no electronic surveillance of any of the defendants or of any of their attorneys. It further states that the Government has in its possession no evidence in connection with this Indictment which was procured directly or indirectly by means of electronic surveillance.

In an attempt to eliminate any possible lingering doubts on this issue, the Court upon oral argument requested that counsel for the defendants reformulate their questions and that the Government in response thereto give an unequivocal reply. Defendants recast their question into a multipronged inquiry which asks whether any agency in the Federal Government has monitored by means of wiretapping, eavesdropping or otherwise any conversation of any person including the defendants, their attorneys or their employees between August 1, 1963 and date relating to:

"(a) any matter alleged in the indictment,

(b) the acquisition by or on behalf of Colonial of any building permit or easement in the Township of Woodbridge, New Jersey,

(c) payments allegedly made to defendants Zirpolo or Jacks, or any one allegedly active on behalf of either one or both of them, by or on behalf of Colonial or any other contractor or subcontractor of Colonial,

(d) reports filed by Colonial with the Interstate Commerce Commission or the Department of Labor, or any books, records or other documents underlining or relating to such reports,

(e) communications or dealings between any Union officials or labor leader and Colonial for any contractor or subcontractor of Colonial concerning the construction of the Colonial Pipeline or any other facility of Colonial in the State of New Jersey, or

(f) the cost of constructing the Colonial Pipeline in the State of New Jersey; or

\* \* \* \* \* \*

(a) the construction or operation of the Colonial Pipeline or of other facilities of Colonial Pipeline Company ('Colonial') in the State of New Jersey, or

(b) acquisitions by or on behalf of Colonial in the State of New Jersey?"

This interrogatory is, as the Government contends, by any reasonable standards, basically unanswerable. By way of response the Government replies that the various agencies involved have indicated that they conducted no electronic surveillance of any of the defendants or of any of their attorneys and that none of those persons were present at or participated in conversations overheard by any electronic device maintained by said agencies. Further the Government states that it has in its possession in connection with this case no evidence obtained directly or indirectly by means of any type of electronic listening device.

Defendants contend that such an answer is incomplete in that it fails to disclose any information in regard to their employees. The Government retorts that to answer such a question would involve a monumental research project involving thousands of persons which would be wasteful, beyond the scope of any duty imposed upon them and, almost certainly, fruitless. It has categorically responded in the negative concerning

any electronic surveillance of defendants or their attorneys. It has further averred that nothing utilized in casting up this case is the product of electronic surveillance. The only reasonable inference to be drawn from such assertions is that, at least as far as this Indictment is concerned, no electronic surveillance has been made of defendants' employees.

■ The most insidious feature of electronic surveillance is that, barring accidental discovery, all disclosure of such surveillance ultimately depends upon the good faith of those who have the power and mechanical ability to utilize this technique. In this case there has been exhaustive and incisive inquiry made concerning any such activity. This Court is of the opinion the controversy which has arisen as a result of that inquiry is, as the immortal Bard once penned, "Much Ado About Nothing." See United States v. Kaminsky, 275 F.Supp. 365 (S.D.N.Y.1967). The motion for further inquiry along this line is denied. Likewise, subsequently filed motions to suppress any evidence illegally obtained through electronic means, there being nothing to suppress, are also denied.

### DISCOVERY

In yet another of the galaxy of pretrial motions brought on by the defendants to this Indictment, movants have made extensive demands for discovery and inspection pursuant to Rules 16 and 6(e) of the Federal Rules of Criminal Procedure. Defendants Jacks and Zirpolo have made identical demands in separate moving papers. All other defendants have moved in one set of papers for disclosure of the information which they seek. The motions will, therefore, be disposed of accordingly.

### JACKS AND ZIRPOLO

These movants demand disclosure of the following items: (1) all statements given by them to the Government, including any statements made by either of them to Fred Stewart and repeated by him to Government agents; (2) the result of any scientific tests; (3) Grand Jury testimony of each movant; (4) Grand Jury testimony of each co-defendant; (5) Grand Jury testimony of Fred Stewart; (6) statements by Stewart to the Government concerning any conversations between him and Jacks or Zirpolo or pertaining to this Indictment in any way; (7) all statements of co-defendants to the Government; (8) all documents subpoenaed from the Building Inspector of Woodbridge Township and not returned thereto; (9) all documents pertaining to this Indictment obtained from co-defendants by subpoena or by any other means; (10) all checks and records related to the alleged bribes; (11) all documents concerning this Indictment obtained by Government process; (12) all back copies of the Woodbridge "Independent-Leader" subpoenaed by the Grand Jury; (13) all records of the Eastern Capital Corporation; (14) all exculpatory material; (15) names and addresses of all witnesses having exculpatory information; and (16) names and addresses of all witnesses whom the Government does not intend to call as such at trial.

These defendants have been furnished with a copy of their Grand Jury testimony. No scientific tests have been performed. The Government has consented to inspection of the documents in its possession subpoenaed from the Building Inspector of Woodbridge Township, as well as to inspection of the records of the Eastern Capital Corporation. Back copies of the newspaper sought to be inspected have been returned to their proper repository and are available at that location.

■ The Government consents to disclosure of all statements of these defendants given to Government agents except statements given to the Government by Fred Stewart, which statements embodied conversations between Stewart and Jacks or Zirpolo (Items 1 and 6

above). Stewart's status as a prospective Government witness precludes revelation of the contents of his statements except in the manner provided for by Rule 16(b), F.R.Cr.P. Insofar as any such statements may embody the contents of conversations which took place between Stewart and Jacks or Zirpolo years before reiteration of the substance of same to the Government, this Court is of the opinion that subsection (a) of Rule 16, F.R.Cr.P. does not mandate the disclosure of Stewart's statements. This is not a situation where the Government, in derogation of the spirit of this Rule, has sought to avoid disclosure by the simple expedient of postponing recordation until sometime subsequent to the narration of the content of the statement sought. United States v. Morrison, 43 F.R.D. 516, 519 (N.D.Ill.1967). Therefore, except to the extent consented to by the Government, this aspect of the discovery motion is denied.

 A proper evaluation of the appropriateness of disclosure of the Grand Jury testimony of co-defendants and Fred Stewart as well as disclosure of statements of Government witnesses and co-defendants is not possible at this time. Therefore, the request for disclosure of said material is denied at present, without prejudice to the renewal of same at the proper juncture of these proceedings. See Dennis v. United States, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966) and 18 U.S.C. § 3500.

 The full measure of disclosure obtainable in criminal proceedings is prescribed in the Federal Rules of Criminal Procedure. The ruling in Brady v. State of Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) was not intended to create an additional pretrial discovery vehicle. It was, rather, a cogent reminder that the primary function of the prosecutor under our system of law is to achieve justice rather than conviction. To that end appropriate remedial processes are available to correct possible abuse arising out of the suppression of exculpatory material. Movants' motion for pretrial discovery of all exculpatory information as well as the names and addresses of all witnesses having such information is denied. See United States v. Cobb, 271 F.Supp. 159, 163 (S.D.N.Y.1967) and United States v. Armantrout, 278 F.Supp. 517, 518 (S.D.N.Y.1968). Since the Government is not required to indicate whom it intends to call as witnesses, it is surely under no obligation to divulge who will not be called upon to testify. Therefore the demand for such information is likewise denied.

 Finally, Jacks and Zirpolo urge that the Government be required to allow inspection and copying of all documents subpoenaed by the Grand Jury or obtained by the Government by any other means from any of the co-defendants. Additionally, they demand the right to inspect and copy all documents pertaining to this Indictment procured by Government process, as well as all records which deal with the alleged bribes. Rule 16(b), F.R.Cr.P. provides, in pertinent part, that:

> "Upon motion of a defendant the court may order the attorney for the government to permit the defendant to inspect and copy or photograph books, papers, documents, tangible objects, buildings or places, or copies or portions thereof, which are within the possession, custody or control of the government, upon a showing of materiality to the preparation of his defense and that the request is reasonable."

The Government's reply to this broad demand is that, with the exception of those documents referred to above, in regard to which it has consented to inspection by movants, the Government has no other documents in its exclusive possession concerning this Indictment. Indeed, it represents that, as to each of the records which was subpoenaed or obtained, the original owner has retained

either the original or a copy of same. Since it appears that the documents sought are available elsewhere and can be located by the exercise of due diligence on the part of counsel for the defense, it is the opinion of this Court that Rule 16(b), F.R.Cr.P. does not entitle the movants to a carte blanche perusal of the content of the Government's documentary file in this case. The purpose of this Rule is to prevent an injustice to a defendant because of the Government's seizure of material which might otherwise have been at the disposal of a defendant to aid him in the preparation of a defense to a criminal charge. The 1966 Amendment was not intended to create a method by which a defendant could demand that the Government assist him in the preparation of his defense by indicating upon which documents it would rely and what amount of weight it would seek to attach to each. The motion is therefore denied. See United States v. Iozia, 13 F.R.D. 335 (S.D.N.Y.1952) and United States v. Cobb, supra, 271 F.Supp. at 162.

### COLONIAL GROUP

All of the other defendants have moved in one set of papers for certain discovery pursuant to Rule 16, F.R.Cr.P. Additionally, Colonial and Rowland Tompkins Corporation have moved for disclosure of certain Grand Jury testimony under Rules 16(a) (3) and 6(e), F.R.Cr.P. Finally, Rowland Tompkins Corporation has also moved separately under Rule 16(b), F.R.Cr.P. to inspect and copy those documents which were identified by or referred to during the testimony of Bankes and Tompkins before the Grand Jury.

■■■ The demand for documents made in behalf of these defendants is, in essence, a demand for an itemized demonstration of the documentary bases of the Government's case. Movants seek to require the Government to produce each piece of paper which it intends to offer in support of its theory of the offenses

charged in this Indictment. This is not the purpose of discovery under this Rule. As indicated above, the Government represents that all of the documentary evidence received by it has been retained in original or copy form by the various corporations from whence it originated. In the case of these movants, therefore, each corporation has, within its own custody, at least a portion of the material which it seeks. Moreover, these movants, as well as Jacks and Zirpolo, have failed to indicate that the material sought is unavailable to them through the exercise of due diligence. The separate demand of Rowland Tompkins Corporation, although more reasonable in its scope, nevertheless fails to indicate that the documents which it seeks are unavailable to it other than by an examination of the Government's file. Therefore this aspect of the discovery motion is denied.

■■■ Parts C and D of the demands by the Colonial Group request that the Government be required to state the purpose of and the procedure followed in the course of certain activities upon which it embarked in reference to this investigation. In view of the protracted evidentiary hearings in which these issues were the main targets of concern, further discovery along this line is unnecessary. Insofar as Part E is not repetitive, it seeks to discover intragovernmental communications and, for that reason, is denied.

Both Rowland Tompkins Corporation and Colonial urge that they are entitled under Rules 16(a) (3) and 6(e), F.R. Cr.P. to examine the Grand Jury testimony of certain individuals. Rowland Tompkins Corporation seeks disclosure of the testimony of Bankes and Tompkins, who were officers of that corporation at the time they testified before the Grand Jury. Fred Stewart, on the other hand, whose Grand Jury testimony is the object of Colonial's request, was not an employee of Colonial at the time he testified.

Movants contend that under Rule 16(a) (3), F.R.Cr.P. an employee, officer or director of a corporation is to be identified with that corporation in its status as defendant to the extent that discovery of such a person's grand jury testimony is allowable under the same criteria used to release the grand jury testimony of an individual defendant. On the other hand, the Government contends that testimony of an officer or employee of a corporate defendant is not the testimony of the corporation but, rather, constitutes the testimony of a Government witness and, as such, is discoverable only upon a showing of particularized need at the time of trial. Each of these movants, in addition to its Rule 16 demand, has asserted circumstances which, each contends, are sufficient to demonstrate particularized need under Rule 6(e), and each requests pretrial disclosure of the desired information upon that ground.

 This Court has recently been confronted with a similar situation in United States v. American Oil Co., supra (July 15, 1968). As was stated upon that occasion, "the outcome of any particular discovery motion is dependent upon a balancing of the competing interests advanced, having in mind the ultimate objectives of justice and a fair trial." In the case of Rowland Tompkins Corporation, the two individuals who testified occupied, at that time, critical positions in what can be characterized as a "family corporation". They testified pursuant to a grant of immunity which the Grand Jury bestowed for reasons best known to that body. Nevertheless, the corporate entity in which these individuals are intimately involved has been made a party defendant. The interests of justice, therefore, require that the testimony of these individuals be made available at this time to the corporate defendant seeking that disclosure.

 In the case of Colonial's request the factors are somewhat different.

Whatever reason underlay the termination of the employer-employee relationship that once existed between Colonial and Stewart, it is undisputed that such a relationship did not exist at the time that Stewart testified before the Grand Jury. Therefore, the proximity of relationship between the party seeking disclosure and the person whose testimony is sought is more tenuous than in the above-mentioned instance. The absence of any such employment relationship endows Stewart with characteristics usually attributed to the status occupied by a Government witness. Several other individual defendants whose interests apparently coincide to a great extent with those of that corporate defendant, and whose positions in its corporate structure are more critical than that of Stewart, also testified before the Grand Jury and were supplied with that testimony with the consent of the Government. In view of these circumstances, this Court is of the opinion that at this juncture of the litigation, the demand by Colonial for the Grand Jury testimony of Fred Stewart should be denied.

### BILLS OF PARTICULARS

 Jacks and Zirpolo have made very similar demands for a Bill of Particulars under Rule 7(f), F.R.Cr.P. As in the case of the immediately preceding motion, all of the other defendants have joined in one motion, with appropriate notation as to the limited applicability of their respective requests in view of their respective positions as defendants in some, but not all, of the Counts of the Indictment. Movants urge that their extensive demands should be granted in view of the recent liberalization of Rule 7(f), F.R.Cr.P. That liberalization amounted to a deletion of the words "for cause" from the original Rule along with certain other alterations which are not material here. As the Note of the Advisory Committee itself indicates, the Amendment to Rule 7 did not eliminate the power of a court to exercise its discretion in dealing with

demands for particulars in individual cases. The deletion of the above-quoted phrase was made to encourage more liberal disposition of requests for particulars in light of the fact that "the cause" of every demand is self-evident in view of the purposes which a bill of particulars is intended to serve. Those purposes are to inform a defendant of the charges against him with sufficient specificity to allow adequate trial preparation, to minimize the danger of surprise at the time of trial, and to enable a defendant to plead acquittal or conviction as a bar to subsequent prosecution. Rule 7(f) in its amended form does not enlarge upon the function to be served by a bill of particulars, and the propriety of requiring disclosure of said particulars continues to reside within the sound discretion of the trial judge. See Wyatt v. United States, 388 F.2d 395 (10 Cir. 1968).

■ The Indictment in this case is extremely lengthy and quite amply detailed. It surely is sufficient to inform defendants of the charges against them and to afford, together with any trial records, a sufficient bar to further prosecution. In addition to the allegations of the Indictment, the Government has divulged certain information in its response to the initial demands of the defendants. Furthermore, the evidentiary hearings which preceded the argument of these motions have also served to provide the defendants with an indication of the Government's contemplated procedure in prosecuting this matter. It is, therefore, highly unlikely that any information not divulged by the Government will produce elements of surprise to prejudice the defendants at the time of trial. The information already in hand is more than sufficient to allow for the adequate preparation of a defense in this matter. Upon consideration of all these elements, this Court finds that there is no need for a disclosure of further particulars, and, therefore, the motion for a Bill of Particulars is denied.

## CONSOLIDATION OR ELECTION OF COUNTS

Movants seek an Order of this Court consolidating the substantive Counts of this Indictment, 2 through 5 and 7 through 9, into two Counts. They urge that such consolidation is required in view of the fact that 18 U.S.C. § 1952 prohibits a course of conduct and that such conduct cannot be fragmented into a series of isolated acts for purposes of prosecution. Alternatively, they urge that if 18 U.S.C. § 1952 be construed to prohibit individual acts, the act in these instances is bribery and each alleged bribe (building permit—Counts 2 through 5—and easements—Counts 7 through 9) originated from but one fresh impulse.

■ Defendants' arguments must fall since they are based upon a misreading of both the Indictment and the statute upon which the Indictment is founded. The particular state offense alleged to have been committed, in this case bribery, merely identifies the objective which Congress has sought to hamper by proscribing the use of interstate commerce and facilities in any manner which promotes the attainment of that activity. Neither the unitary nature attributed to the state offense indicated, nor the singularity of the impulse to achieve that objective can be made the measure of the unit of prosecution under a statute which prohibits interstate travel or the use of interstate facilities. A single act whether it consists of bribery, extortion or arson, in violation of state law, coupled with travel in interstate commerce or use of interstate facilities in furtherance of same is sufficient to trigger the applicability of this statute. Within that framework, however, it is each act of traveling in interstate commerce and each use of interstate facilities which Congress has banned. The fresh impulse for which the defendants are to be held accountable is not the impulse which resulted in an alleged bribe but rather each impulse

which resulted in the alleged unlawful use of interstate commerce or facilities. See Marshall v. United States, supra, and United States v. Teemer, 214 F. Supp. 952 (N.D.W.Va.1963). There is, at this stage, nothing before the Court to indicate that an election of Counts is appropriate. Therefore, these motions are denied.

## PUBLIC TRIAL

■ During the evidentiary hearings concerning the claims of immunity made by Giles, Feldman and Leuty, the defendant Zirpolo contended that the Grand Jury testimony upon which the claimed immunity was based had to be either introduced into evidence or otherwise made a part of the public court record in this case. The failure to do so, movant contended, would result in deprivation of this defendant's Sixth Amendment right to a public trial. This Court is of the opinion that this motion is without merit. The Grand Jury minutes are always a part of the record of this Court and may be disclosed when the interests of justice so require. Therefore, the motion is denied.

Let an Order in conformity with the foregoing Opinion be presented.